# RECORD NO. 14-1150

## IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

GRETCHEN S. STUART, M.D., *ET AL.*,

*Plaintiffs - Appellees,*

v.

PAUL S. CAMNITZ, M.D., *ET AL.*,

*Defendants - Appellants.*

JOHN M. THORP, JR., M.D.

*Intervenor - Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
THE HONORABLE CATHERINE C. EAGLES, PRESIDING

BRIEF OF *AMICI CURIAE* NORTH CAROLINA HOUSE OF REPRESENTATIVES
RUTH SAMUELSON, PAT McELRAFT, PAT HURLEY, MARILYN AVILA, SUSAN
MARTIN, CAROLYN JUSTICE, RENA TURNER, MICHELE D. PRESNELL, SARAH
STEVENS, JACQUELINE MICHELLE SCHAFFER, DEBRA CONRAD, MARK BRODY,
CHRIS WHITMIRE, ALLEN McNEILL, DONNY LAMBETH, GEORGE CLEVELAND,
AND LINDA JOHNSON, AND SENATORS DAVID CURTIS, JOYCE KRAWIEC,
SHIRLEY RANDLEMEN, DAN SOUCEK, NORMAN SANDERSON, WARREN DANIEL,
BUCK NEWTON, KATHY HARRINGTON, AND ANDREW BROCK
IN SUPPORT OF DEFENDANTS-APPELLANTS AND
REVERSAL OF THE LOWER COURT

Scott W. Gaylord
  *Jennings Professor*
Thomas J. Molony
  *Associate Professor of Law*
Elon University School of Law
201 North Greene Street
Greensboro, NC 27401
(336) 279-9200
sgaylord@elon.edu
tmolony@elon.edu

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF AMICI ........................................................................ 1

SUMMARY OF ARGUMENT ............................................................. 2

ARGUMENT ....................................................................................... 7

    I.    North Carolina's speech-and-display provision satisfies rational basis review under *Casey* because it requires the disclosure only of relevant, truthful, and nonmisleading information ......................... 10

    II.   Given the State's substantial interest in regulating the medical profession and the fact that North Carolina's speech-and-display provision requires physicians to provide information that is truthful, nonmisleading, and relevant, North Carolina's statute does not infringe on a physician's First Amendment right not to speak .......................................................... 15

    III.  Under the Fourth Circuit's professional speech doctrine, North Carolina's speech-and-display law is constitutional because it is a legitimate and reasonable regulation of the medical profession ...... 25

CONCLUSION .................................................................................. 28

CERTIFICATE OF COMPLIANCE ................................................... 29

CERTIFICATE OF SERVICE ............................................................ 30

i

# TABLE OF AUTHORITIES

## CASES

Page

*Accountant's Society of Va. v. Bowman*,
   860 F.2d 602 (4th Cir. 1988) ..........................................6, 26, 27, 28

*Akron v. Akron Ctr. For Reprod. Health*,
   462 U.S. 416 (1983) ......................................................................14

*F.C.C. v. Beach Commc'ns, Inc.*,
   508 U.S. 307 (1993) ........................................................................4

*Gentile v. State Bar of Nevada*,
   501 U.S. 1030 (1991) ......................................................................7

*Gonzales v. Carhart*,
   550 U.S. 124 (2007) ....................................................4, 5, 7, 17, 22, 23

*Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor of Baltimore*,
   721 F.3d 264 (4th Cir. 2013) ........................................................3, 7

*Locke v. Shore*,
   634 F.3d 1185 (11th Cir. 2011) ......................................................27

*Moore-King v. County of Chesterfield, Va.*,
   708 F.3d 560 (4th Cir. 2013) ......................................................6, 26

*Pickup v. Brown*,
   740 F.3d 1208 (9th Cir. 2014) ......................................................8, 24

*Planned Parenthood Minn., N.D., S.D. v. Rounds*,
   530 F.3d 724 (8th Cir. 2008) ......................................................8, 12

*Planned Parenthood of Greater Texas Surgical Health Services v. Abbot*,
   2014 WL 1257965 (5th Cir. 2014) ..................................................4

ii

*Planned Parenthood of Se. Pa. v. Casey*,
505 U.S. 833 (1992)............................................................................*passim*

*Riley v. National Federal of the Blind of N.C., Inc.*,
487 U.S. 781 (1988)....................................................................................3, 7

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
547 U.S. 47 (2006)...........................................................................................23

*Stuart v. Loomis*,
2014 WL 186310 (M.D.N.C. 2014) ....................... 5, 14, 15, 19, 21, 24, 26, 27

*Tex. Medical Providers Performing Abortion Services v. Lakey*,
667 F.3d 570 (5th Cir. 2012) ..........................................................8, 10, 12, 13

*West Virginia State Board of Education v. Barnette*,
319 U.S. 624 (1943)..............................................................................7, 21, 23

*Whalen v. Roe*,
429 U.S. 589 (1977)................................................................2, 9, 17, 18, 20

*Wooley v. Maynard*,
430 U.S. 705 (1977)..............................................................................17, 21

*Zauderer v. Office of Disciplinary Counsel*,
471 U.S. 626 (1985)........................................................................4, 8, 21, 25

## STATUTES

N.C. Gen. Stat. § 90-21.80 – 90-21.92 ....................................................................1
N.C. Gen. Stat. § 90-21.85 ........................................................................................1
N.C. Gen. Stat. § 130A-215.5 ................................................................................24

## CONSTITUTION

U.S. Const. Amend I ........................................... 1, 4, 7, 9, 10, 20, 21,25-27
U.S. Const. Amend XIV .........................................................................10

# OTHER AUTHORITIES

Abortion rights under assault, Salon.com, Oct. 21, 2012, available at
    http://www.salon.com/2012/10/21/its_not_just_forced_ultrasound_abort
    ion_rights_under_assault/ .................................................................16

Janie Benson et al., Early abortion services in the United States:   a provider
    survey, 67 Contraception 289 available at
    http://www.sciencedirect.com/science/article/pii/S0010782402005127# .. 15-16

Pennsylvania Abortion Control Act of 1982 .........................................................10

Robert C. Post, *Democracy, Expertise, and Academic Freedom* 24 (2012) ...........24

Robert C. Post*, Informed Consent to Abortion: A First Amendment Analysis
    of Compelled Physician Speech,* 2007 U. Ill. L. Rev. 939, 949 (2007) ...........4

# INTERESTS OF AMICI[1]

*Amici Curiae* are current and former members of the North Carolina House of Representatives and North Carolina Senate who sponsored, voted for, or support The Woman's Right to Know Act (the "Act"), which the North Carolina General Assembly enacted in 2011. *See* N.C. Gen. Stat. §§ 90-21.80 through 90-21.92. Section 90-21.85 of the Act contains the "speech-and-display provision" that is the subject of this appeal.

As legislators who sponsored, voted for, or support the Act, *Amici* have a special interest in the outcome of this case. In particular, *Amici* are interested in protecting the health and welfare of all women in North Carolina and in ensuring that the courts uphold a constitutional law enacted by the legislature. *Amici* know that pregnancy is a life-altering event and that it is important for all women contemplating abortion to "apprehend the full consequences of [that] decision." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 882 (1992). For this reason, *Amici* write to defend the constitutionality of the Act and the speech-and-display provision. As a result, *Amici* have a direct interest in this litigation and believe that their years of legislative experience will provide this Court with an

---

[1] The parties have consented to the filing of this brief. As required by Rule 29(c)(5), *amici* state that no counsel for a party authored this brief in whole or in part, and no person other than the *amici* and their counsel made any monetary contribution intended to fund the preparation or submission of this brief.

important perspective on the issues implicated by North Carolina's speech-and-display provision.

## SUMMARY OF ARGUMENT

The district court made two fundamental errors that led it to improperly conclude that North Carolina's ultrasound legislation violates the First Amendment speech rights of physicians. First, although it acknowledged that context matters when determining the standard of review for First Amendment speech claims, the district court failed to appreciate the specific setting of the speech in this case—mandatory disclosures related to the practice of medicine. Second, having missed the proper context, the district court applied the wrong standard, subjecting North Carolina's speech-and-display provision to heightened scrutiny rather than the rational basis review that *Casey* dictates. These errors are fatal to the court's analysis and warrant reversal.

In relying on Supreme Court cases that discuss compelled speech outside the medical context, the district court disregards a central teaching of *Casey*: that "[the] constitutional status [of] the doctor-patient relation … in the [provision of abortion services] is derivative of the woman's position." *Casey*, 505 U.S. at 833; *Whalen v. Roe*, 429 U.S. 589, 604 (1977) (holding that to the extent the compelled disclosures impaired the doctors' "right to practice medicine free of unwarranted state interference … the doctors' claim is derivative from, and therefore no

2

stronger than, the patients'."). Under *Casey*, compelled disclosures that do not impose an undue burden on a woman's right to choose abortion are subject only to rational basis review. *See Casey*, 505 U.S. at 878 (concluding that, unless it presents a substantial obstacle to a woman's right to choose, "a state measure designed to persuade her to choose childbirth over abortion will be upheld if reasonably related to that goal."). Thus, the district court erred by employing a higher standard of review for the physicians' claims in this case—heightened scrutiny—than the deferential standard *Casey*, *Whalen*, and this Circuit apply to claims of patients, from whom physicians' rights derive.

That rational basis review applies to compelled disclosures relating to the practice of medicine follows directly from the Supreme Court's recognition in *Riley* that the standard of review to apply depends on the context of the speech. *See Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988); *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor of Baltimore*, 721 F.3d 264, 286 (4th Cir. 2013) (quoting *Riley* and confirming that "context matters"). When reviewing abortion-related disclosures, *Casey* articulates the governing standard: provided that "the information the State requires to be made available to the woman is truthful and not misleading," North Carolina may "further its legitimate goal of protecting the life of the unborn by enacting legislation aimed at ensuring a decision that is mature and informed, even when in

so doing the State expresses a preference for childbirth over abortion." *Casey¸* 505 U.S. 882-83; *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985) (applying rational basis review to compelled disclosures in advertising "because disclosure requirements trench much more narrowly" on First Amendment rights than do restrictions on speech).   Although *Casey* acknowledges that such disclosure requirements implicate the First Amendment rights of physicians, the Court cites *Whalen* to confirm that, in the context "of the practice of medicine," physicians are "subject to reasonable licensing and regulation by the State." *Casey*, 505 U.S. at 884; Robert C. Post, *Informed Consent to Abortion:  A First Amendment Analysis of Compelled Physician Speech*, 2007 U. Ill. L. Rev. 939, 949 (2007) ("[W]hen a physician speaks to a patient in the course of medical treatment, his opinions are normally regulated on the theory that they are inseparable from the practice of medicine.").   Given the State's "significant role … in regulating the medical profession," *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007), *Casey* applies only rational basis review to compelled disclosures relating to medical procedures.[2]

---

[2] Because the district court settled on the incorrect standard of review, it also erroneously imposed a heightened evidentiary burden on the State—one inconsistent with *Casey* and *Gonzales*.  Under rational basis review, a court need "only determine whether any conceivable rationale exists for an enactment[;] … the state is not required to 'prove' that the objective of the law would be fulfilled." *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbot*, 2014 WL 1257965, at *7 (5th Cir. 2014) (citing *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, 315 (1993)).  *Casey* conclusively establishes that the State has important

Instead of analyzing the Court's discussion of reasonable disclosure requirements in *Whalen* and *Casey*, however, the district court surreptitiously reintroduced the strict scrutiny standard that the Court had applied in *Roe v. Wade*, *Akron v. Akron Ctr. for Reproductive Health*, and *Thornburgh* v. *American College of Obstetricians & Gynecologists*, but had rejected in *Casey*. As *Casey* notes, the *Thornburgh* Court found two main problems with the ordinances in *Akron*: "the information was designed to dissuade the woman from having an abortion and the ordinance imposed 'a rigid requirement that a specific body of information be given in all cases, irrespective of the particular needs of the patient.'" *Casey*, 505 U.S. at 882 (citation omitted). The district court repeatedly contends that North Carolina's speech-and-display provision is unconstitutional for the same reasons. *See, e.g., Stuart v. Loomis*, 2014 WL 186310 at *12 (M.D.N.C. 2014) ("[T]he Act requires providers to actually *deliver* the information to every single patient who

---

interests in making sure a woman's choice is informed and in protecting the life of the unborn, and the State may pursue those goals by requiring that "a specific body of information be given in all cases, irrespective of the particular needs of the patient." *Casey*, 505 U.S. at 882 (citation omitted). By compelling disclosure in all cases, the speech-and-display provision offers every woman who *might* consider the disclosed information valuable unfettered access to it, while giving those who do not want the information or who think they might be harmed by it a way to opt out. To the extent the Act does not provide a sufficient safeguard in a particular case, an as-applied challenged is the proper means for seeking relief. *See Gonzales*, 550 U.S. at 167 ("[An as-applied challenge] is the proper manner to protect the health of the woman if it can be shown that in discrete and well-defined instances a particular condition has or is likely to occur in which the procedure prohibited by the Act must be used.").

seeks an abortion, even those who object to receiving it or who would be harmed by it."). Because the Supreme Court expressly overruled *Akron* and *Thornburgh* to the extent they barred "the giving of truthful, nonmisleading information about the nature of the procedure, and … the 'probable gestational age' of the fetus," this Court should reject the district court's analysis, which is rooted in *Akron*'s and *Thornburgh*'s strict scrutiny standard, and apply rational basis review as *Casey* requires.

Finally, the district court's use of heightened scrutiny is inconsistent with the Fourth Circuit's professional speech doctrine. Under this doctrine, when a professional "is providing personalized advice in a private setting to a paying client," *Moore-King v. County of Chesterfield, Va.*, 708 F.3d 560, 569 (4th Cir. 2013), a regulation of the professional's speech is subject only to rational basis review: "A statute that governs the practice of an occupation is not unconstitutional as an abridgment of the right to free speech, so long as 'any inhibition of the right is merely the incidental effect of observing an otherwise legitimate regulation.'" *Accountant's Soc'y of Va. v. Bowman*, 860 F.2d 602, 604 (4th Cir. 1988) (citation omitted). Although strict scrutiny may apply when a State restricts professional speech directed at the public, North Carolina's ultrasound legislation does not abridge a physician's public commentary on any issue. Thus,

under the Fourth Circuit's professional speech doctrine, North Carolina's ultrasound legislation is subject to rational basis review, not heightened scrutiny.

## ARGUMENT

The First Amendment states that "Congress shall make no law … abridging the freedom of speech."  U.S. Const. Amend I.  Given the myriad ways in which freedom of speech can be implicated, the Court has not adopted a single standard for reviewing First Amendment speech claims.  With respect to compelled speech, the Court has instructed that "context" is dispositive.  See *Riley*, 487 U.S. at 796 ("Our lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon."); *Greater Baltimore Center for Pregnancy Concerns*, 721 F.3d at 286 (recognizing that, when evaluating compelled disclosures, "context matters").  When the government attempts to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein," the Court applies strict scrutiny.  *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  When, however, "the State has a significant role to play in regulating" activity in a given context, government-compelled disclosures are subject to a lower standard of review.  *Gonzales*, 550 U.S. at 157; *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1076 (1991) ("When a state regulation implicates First Amendment rights, the

court must balance those interests against the State's legitimate interest in regulating the activity in question."). In the medical practice and commercial advertising contexts, the Court applies only rational basis review. *See Casey*, 505 U.S. at 884 (upholding State-mandated disclosures because "the practice of medicine [is] subject to reasonable … regulation by the State"); *Zauderer,* 471 U.S. at 651 (recognizing that disclosure requirements aimed at misleading commercial speech need only be "reasonably related to the State's interest in preventing deception of consumers").

Although the district court suggested that context matters, it failed to focus on the context at issue in this case—disclosures related to the practice of medicine. In this context, *Casey* provides the governing First Amendment standard, and as the Fifth, Eighth, and Ninth Circuits have recognized, that standard is rational basis. *See Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 575 (5th Cir. 2012); *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 733-34 (8th Cir. 2008); *Pickup v. Brown*, 740 F.3d 1208, 1231 (9th Cir. 2014).[3] Yet instead of starting its analysis with *Casey*, the district court launched

---

[3] After the district court entered its order in this case, the Ninth Circuit amended its *Pickup* opinion. As amended, the opinion expressly recognizes that *Casey* applies rational basis review to the physicians' First Amendment claims. *See Pickup*, 740 F.3d at 1231 ("Because SB 1172 regulates only treatment, while leaving mental health providers free to discuss and recommend, or recommend against, SOCE, we conclude that any effect it may have on free speech is merely incidental.

into an extensive discussion of First Amendment jurisprudence in a variety of other, inapplicable contexts, ultimately declaring that some unspecified form of "heightened scrutiny" applied to North Carolina's speech-and-display provision. The district court looked to *Casey* only near the end of its analysis and then only to support the decision it already had reached.

In particular, the district court emphasized *Casey*'s citation to *Wooley* for the proposition that compelled disclosures "implicate" a physician's First Amendment speech rights. Remarkably, though, the district court omitted *Casey*'s important— indeed critical—qualification that the physician's speech rights are implicated "only as part of the practice of medicine, subject to reasonable licensing and regulation by the State." *Casey*, 505 U.S. at 884. Given the context—the practice of medicine—the compelled disclosures in *Casey* were subject only to rational basis review because, as in *Whalen*, it could not "be said that any individual has been deprived of the right to decide independently, with the advice of [her] physician," whether to have an abortion. *Whalen*, 429 U.S. at 603. Thus, this Court should reverse.

---

Therefore, we hold that SB 1172 is subject to only rational basis review …. *See Casey*, 505 U.S. at 884.").

9

**I. North Carolina's speech-and-display provision satisfies rational basis review under *Casey* because it requires the disclosure only of relevant, truthful, and nonmisleading information.**

In *Casey*, a plurality of the Supreme Court upheld a state statute that required "the giving of truthful, nonmisleading information about the nature of [an abortion] procedure, the attendant health risks and those of childbirth, and the 'probable gestational age' of the fetus." *Casey*, 505 U.S. at 882. Drawing on *Casey*, North Carolina adopted its speech-and-display provision to provide women considering an abortion with additional "truthful, nonmisleading" information "to ensure that a woman apprehend the full consequences of her decision." *Id.*; *Lakey*, 667 F.3d at 577-78 ("To belabor the obvious and conceded point, the required disclosures of a sonogram, the fetal heartbeat, and their medical descriptions are the epitome of truthful, non-misleading information.").

*Casey* expressly ruled on a First Amendment challenge to compelled abortion-related disclosures within the physician-patient relationship. Therefore, to determine whether North Carolina's speech-and-display provision is constitutional, this Court should follow *Casey*.

In *Casey*, the Court considered a Fourteenth Amendment due process challenge to the Pennsylvania Abortion Control Act of 1982, as amended, which has served as a model for informed consent provisions in North Carolina and numerous other States. The Pennsylvania statute required: "a physician [to] inform

10

the woman of the nature of the procedure, the health risks of the abortion and of childbirth, and the 'probable gestational age of the unborn child'" and required "[t]he physician or a qualified nonphysician [to] inform the woman of the availability of printed materials published by the State" that described the fetus and provided information about medical assistance, paternity obligations, and abortion alternatives. *Casey*, 505 U.S. at 881. Among other things, the informed consent provision was intended to protect the "psychological well-being" of the woman by "ensur[ing] that [she] apprehend the full consequences of her decision" and "to further [the State's] legitimate goal of protecting the life of the unborn by enacting legislation aimed at ensuring a decision that is mature and informed." *Id*. at 882-83.

The plurality upheld Pennsylvania's informed consent requirements under its newly announced undue burden test, which was designed to safeguard the central right protected by the due process clause: "the woman's right to make the ultimate decision." *Id.* at 877. Under the undue burden test, a State regulation is constitutional if it is reasonable and does not have "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id*. As the plurality noted, "[u]nless it has that effect on her right of choice, a state measure designed to persuade her to choose childbirth over abortion will be upheld if reasonably related to that goal." *Id*. at 878. According to *Casey*, an

11

informed consent regulation is reasonable if it is "truthful," "nonmisleading," and "relevant … to the decision." *Id.* at 882. Consequently, North Carolina's speech-and-display provision is constitutional if it (1) does not create a substantial obstacle to a woman's exercise of her rights and (2) is reasonable, *i.e.*, requires the disclosure of truthful, nonmisleading, and relevant information. *See Lakey*, 667 F.3d at 577 (holding that speech-and-display provisions are constitutional "[i]f the disclosures are truthful and non-misleading, and if they would not violate the woman's privacy right" under *Casey*); *Rounds*, 530 F.3d at 734-35 (8th Cir. 2008) (interpreting *Casey* and *Gonzales* to hold that the State "can use its regulatory authority to require a physician to provide truthful, non-misleading information relevant to a patient's decision to have an abortion").

Notwithstanding *Casey*'s admonition that the physician's rights are derivative of the woman's, the district court failed to apply *Casey*'s rational basis standard, opting instead for "heightened scrutiny." In so doing, the district court simply ignored *Casey*'s repeated references to Pennsylvania's "*legitimate* goal" of protecting unborn life and its express acknowledgment that compelled physician disclosures are permissible "as part of the practice of medicine, [which is] subject to *reasonable* … regulation by the State." *Casey*, 505 U.S. at 884 (emphasis added). Moreover, the district court's conclusion that the plurality applied strict scrutiny to the physicians' First Amendment speech claims is unsupported by the

12

*Casey* opinion, which neither mentions, let alone discusses, any compelling interest that Pennsylvania had in requiring physicians to speak nor considers whether the Pennsylvania statute was narrowly tailored. In addition, the district court's analysis is inconsistent with opinions of the Fifth, Eighth, and Ninth Circuits, each of which interprets *Casey* as applying rational basis review to the physicians' claims. As the Fifth Circuit explains, *Casey*'s analysis is "the antithesis of strict scrutiny." *Lakey*, 667 F.3d at 575.

*Casey* found "no constitutional infirmity" with the Pennsylvania's informed consent statute because the required disclosures were truthful and nonmisleading. *Casey*, 505 U.S. at 884. The same is true of North Carolina's speech-and-display provisions. Although modern ultrasounds may provide information that is "more graphic and scientifically up-to-date[] than the disclosures discussed in *Casey*," the information "is not different in kind." *Lakey*, 667 F.3d at 578. Thus, under *Casey*, North Carolina's speech-and-display provision is a reasonable regulation and should be upheld.

The district court's decision, therefore, should be viewed for what it is—an attempt to resurrect the Supreme Court's (now discredited) reasoning in *Akron* and *Thornburgh*. In both of these pre-*Casey* opinions, the Court invalidated informed consent provisions that were designed to persuade a woman not to have an abortion and that required physicians to disclose "a specific body of information …

13

irrespective of the particular needs of the patient." *Casey*, 505 U.S. at 882 (citation omitted). Like the district court here, the *Akron* Court was concerned that a physician would be required to deliver information to a woman that might be irrelevant to her particular situation. *See Akron*, 462 U.S. at 445 ("For example, even if a physician believes that some of the risks outlined in subsection (5) are nonexistent for a particular patient, he remains obligated to described them to her."); *Thornburgh*, 476 U.S. at 762 ("The mandated description of fetal characteristics at 2-week intervals, no matter how objective, is plainly overinclusive. This is not medical information that is always relevant to the woman's decision."). Not surprisingly, given its reliance on *Akron* and *Thornburgh*, the district court struck down North Carolina's speech-and-display provision for the same reasons that *Thornburgh* invalidated Pennsylvania's informed consent provisions. *Compare Thornburgh*, 476 U.S. at 762 (suggesting that information about fetal characteristics might "serve only to confuse and punish [the woman] and to heighten her anxiety, contrary to accepted medical practice) with *Stuart*, 2014 WL 186310 at *12 (stating that "the Act requires providers to actually *deliver* the information … to patients whose physical or mental health would be placed at serious risk") and *Thornburgh*, 476 U.S. at 763 (indicating that requiring information about medical assistance and paternity may, "[f]or a patient with a life-threatening pregnancy, … be cruel as well as destructive of the

14

physician-patient relationship" and asserting that "a victim of rape should not have to hear gratuitous advice that an unidentified perpetrator is liable for support") *with Stuart*, 2014 WL 186310, at *17 (contending that "the state would have a physician attempt to persuade a woman not to have an abortion … even if she will die if she continues her pregnancy and even if she has a mental health history that makes forced and graphic delivery of this information … a risky proposition").[4]   This Court, therefore, should reverse the district court for the same reasons that *Casey* overruled *Akron* and *Thornburgh*—it "go[es] too far" and undervalues the State's "important interest in potential life." *Casey*, 505 U.S. at 882.

## II. Given the State's substantial interest in regulating the medical profession and the fact that North Carolina's speech-and-display provision requires physicians to provide information that is truthful, nonmisleading, and relevant, North Carolina's statute does not infringe on a physician's First Amendment right not to speak.

Under *Casey*, North Carolina's speech-and-display provision does not constitute an undue burden on a woman's right to choose.[5]   The State requires

---

[4] The district court effectively repeats the claims of the petitioners in *Casey*, who argued that Pennsylvania's informed consent statute compelled ideological speech that triggered and failed strict scrutiny because it "forced [physicians] to convey the state's message at the cost of violating their own conscientious beliefs and professional commitments." *Brief for Pet'rs and Cross-Resp'ts*, *Casey*, 505 U.S. 833 (1992) (Nos. 91-744, 91-902), 1992 WL 551419, at *16, *53-54.

[5] The appellees do not—and cannot—argue that requiring an ultrasound constitutes an undue burden under *Casey*.   North Carolina has required pre-abortion ultrasounds since 1994, and such ultrasounds are conducted routinely across the country. *See, e.g.*, Janie Benson et al., <u>Early abortion services in the United States:</u>

doctors to provide additional truthful and nonmisleading information regarding the fetus to advance the State's important interest in the psychological health of the mother and "to further its legitimate goal of protecting the life of the unborn by enacting legislation aimed at ensuring a decision that is mature and informed." *Casey*, 505 U.S. at 883. The woman in consultation with her physician, though, ultimately makes the decision whether to have an abortion. Thus, the speech-and-display provision does not impose a substantial obstacle and, as *Casey* states, the disclosure requirements need be only reasonable.

*Casey* also recognizes that, as to compelled disclosures relating to medical practice, a physician's right "is derivative of the woman's position" because the "doctor-patient relation does not underlie or override the two more general rights under which the abortion right is justified: the right to make family decisions and the right to physical autonomy." *Id*. at 884. Given that the Court's undue burden test would apply to a woman's challenge to North Carolina's speech-and-display

---

a provider survey, 67 Contraception 289, 290, available at http://www.sciencedirect.com/science/article/pii/S0010782402005127# (finding that 83% of the abortion-service sites studied *always* performed an ultrasound before an early surgical abortion and 92% *always* performed one before a medical abortion); It's not just forced ultrasound: Abortion rights under assault, Salon.com, Oct. 21, 2012, available at http://www.salon.com/2012/10/21/its_not_just_forced_ultrasound_abortion_rights_under_assault/ ("Ultrasounds are a routine procedure at Planned Parenthood and many other clinics, a tool doctors use to gauge gestational age—which can affect which procedure to use—or to detect complications.")

provision, a physician cannot claim a higher level of review.  That is, because the physician's rights are derived from those of his or her patient, the doctor cannot receive greater protection under the First Amendment than the patient gets under the due process clause: "a requirement that a doctor give a woman certain information as part of obtaining her consent to an abortion is, for constitutional purposes, no different from a requirement that a doctor give certain specific information about any medical procedure."  *Id*.; *see Gonzales*, 550 U.S. at 163 ("The law need not give abortion doctors unfettered choice in the course of their medical practice, nor should it elevate their status above other physicians in the medical community."); *Whalen*, 429 U.S. at 604 n.33 ("Nothing in [*Doe v. Bolton*] suggests that a doctor's right to administer medical care has any greater strength than his patient's right to receive such care.").  Given that "the State has a significant role to play in regulating the medical profession," the government can require reasonable disclosures to "ensur[e] a decision that is mature and informed." *Casey*, 505 U.S. at 883.  Such disclosure requirements did not constitute an undue burden in *Casey* and, consequently, were subject to rational basis review—the same standard *Casey* applies to the physicians' First Amendment claims: "To be sure, the physician's First Amendment rights not to speak are implicated, see *Wooley v. Maynard*, 430 U.S. 705 (1977), but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State, cf. *Whalen v.*

17

*Roe*, 429 U.S. 589, 603 (1977)." *Id.* at 884.

By focusing only on *Casey*'s reference to *Wooley*, the district court defaults to strict scrutiny. Any complete account of *Casey*, though, also must explain the Court's invocation of *Whalen v. Roe*, which confirms that restrictions on the medical profession are subject to rational basis review. In the portion of *Whalen* to which *Casey* refers, the Court recognizes that the State has broad latitude to regulate the practice of medicine. In *Whalen*, as in *Casey*, it is the ability of a patient to make a decision in consultation with her physician that "is at stake." *Casey*, 505 U.S. at 877. So long as "the decision … is left entirely to the physician and the patient," *Whalen*, 429 U.S. at 603, the State has substantial freedom to adopt reasonable regulations that may affect the decision-making process.

The similarities between *Casey* and *Whalen* are striking. Both involve claims that a State law compelling disclosures violated a patient's Fourteenth Amendment rights in connection with a medical procedure or treatment. Both emphasize that the patient must have the right to make the ultimate decision about the medical procedure or treatment, but that the State may adopt regulations—even ones that might be considered unnecessary—that affect that right. Both include allegations that the governing laws violated the rights of patients and physicians. Both indicate that the State may require physicians to engage in activities that burden the physicians' practice of medicine. Both hold that the rights of the

physician are "derivative" of those of the patient and, consequently, both dispose of the physicians' claims in a single paragraph.  In light of *Whalen*, then, it is easy to see why *Casey* summarily disposed of the physicians' First Amendment claims. Because the compelled disclosures did not unduly burden a woman's right to choose, there was "no constitutional infirmity in the requirement that the physician provide the information."  *Casey*, 505 U.S. at 884.

Yet the district court completely ignores *Casey*'s reference to *Whalen* and its admonition that the doctor's rights are derivative of the woman's rights in the abortion context.  As a result, the district court improperly contends that applying rational basis review to the physicians' claims creates a new First Amendment test: "[*Lakey* and *Rounds*] read *Casey* as creating, in two sentences, an entirely new category of abortion-related compelled speech to which a unique standard of review applies."  *Stuart*, 2014 WL 186310 at *17.[6]  *Casey* does not apply a due

---

[6] Although rejecting this allegedly "new standard," the district court contends that the speech-and-display provision fails that standard for two reasons, both of which are inconsistent with *Casey*.  First, the court slips back into a strict scrutiny analysis, arguing that such a disclosure requirement is not narrowly tailored: "the Act by its terms says that the information is not necessary or relevant to *every* woman's decision."  2014 WL 186310, at *17 (emphasis added).  As explained above, this conclusion hearkens back to the parts of *Akron* and *Thornburgh* that *Casey* explicitly overruled.  Second, the district court claims that the speech-and-display provision is unconstitutional because it is "an 'unnecessary health regulation[]' which is not allowed under *Casey*."  2014 WL 186310, at *18.  This conclusion ignores (1) *Casey*'s recognition that the State "may take measures to ensure that the woman's choice is informed, and measures designed to advance this

process standard to the First Amendment; rather, it recognizes that, since (1) the disclosure requirements do not impose a substantial obstacle to the woman's ability to choose abortion and (2) the physician's rights are derived from the patient's, such disclosure requirements do not violate the First Amendment in the context of abortion-related or any other medical practice if the requirements are reasonable. Such requirements "implicate" the physician's First Amendment rights, but in the context of "the practice of medicine," compelled disclosures are constitutional provided that they are "reasonable … regulation[s] by the State." *Casey*, 505 U.S. at 884. *Whalen* draws on *Doe v. Bolton* to confirm this understanding of a physician's rights: "[n]othing in [*Doe*] suggests that a doctor's right to administer medical care has any greater strength than his patient's right to receive such care. … If [the abortion restrictions at issue in *Doe*] had not impacted upon the woman's freedom to make a constitutionally protected decision, if they had merely made the physician's work more laborious or less independent without any impact on the patient, they would not have violated the Constitution." *Whalen*, 429 U.S. at 604 n.33.

Contrary to the district court's opinion, therefore, applying rational basis

---

interest will not be invalidated as long as their purpose is to persuade the woman to choose childbirth over abortion," and (2) the fact that *Casey* rejected only those "[u]nnecessary health regulations" that present a *substantial* obstacle to a woman seeking an abortion." *Casey*, 505 U.S. at 878 (emphasis added).

review to compelled disclosures in the practice of medicine neither is unique nor "ignore[s] the values memorialized in the First Amendment." *Stuart*, 2014 WL 186310, at *17. Rather, such a standard is mandated by *Casey* and is consistent with the First Amendment values set forth in *Zauderer*.[7] In *Zauderer*, the State of Ohio required attorneys who advertise that they are willing to represent clients on a contingent-fee basis "to state that the client may have to bear certain expenses even if he loses." 471 U.S. at 650. Although the *Zauderer* Court acknowledges that speech compulsions were struck down in *Wooley* and *Barnette*, it distinguishes those cases: "the interests at stake in this case are not of the same order as those discussed" in the prior compelled speech cases because Ohio was "not attempting to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.'" *Id*. at 651 (*quoting Barnette*, 319 U.S. at 642).[8] Instead, Ohio sought only to

---

[7] The district court suggests that *Zauderer* "could not" apply to the speech-and-display provision because that "provision compels speech as part and parcel of the delivery of professional advice and services, not in the context of advertising." *Stuart*, 2014 WL 186310, at *11. The district court, however, does not consider that *Zauderer* speaks directly to the First Amendment values that are implicated by compelled speech where the government has a substantial interest in regulating a specific context, such as commercial advertising and medical practice.

[8] In *Wooley*, the Court also emphasized the public nature of the disclosures: "Here, as in *Barnette*, we are faced with a state measure which forces an individual, as part of his daily life—indeed constantly while his automobile is in public view—to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." 430 U.S. at 715. North Carolina's speech-and-display

specify "what shall be orthodox in commercial advertising," requiring attorneys to include in their advertising "purely factual and uncontroversial information about the terms under which [their] services will be available." *Id*. Ohio's regulation, therefore, did not "prevent attorneys from conveying information to the public; it … only required them to provide somewhat more information than they might otherwise be inclined to present." *Id*. In upholding the disclosure requirement, the Court emphasizes that "[w]e do not suggest that disclosure requirements do not implicate the advertiser's First Amendment rights at all." *Id*. Although "unjustified or unduly burdensome" requirements might violate the attorneys' First Amendment rights, the Court concludes that their speech rights are "adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Id*.

The similarity to North Carolina's speech-and-display provision is stunning. As in *Zauderer*, North Carolina has not prevented doctors from conveying any information to the public or to their patients—about their views on the speech-and-display provision, informed consent laws, or any other issue; it has required them only to provide information that they might otherwise not be inclined to present. *See Gonzales*, 550 U.S. at 159 ("In a decision so fraught with emotional

provision does not mandate "public adherence" to any position. Rather, it requires specific disclosures that are directly relevant to its substantial interests in women's psychological health and protecting the life of the unborn.

consequence some doctors may prefer not to disclose precise details of the means that will be used…. It is, however, precisely this lack of information … that is of legitimate concern to the state."). To the extent some physicians do not think that the required disclosures are medically relevant, those physicians are free to explain their views both to the public and to a woman seeking an abortion, *see Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 60 (2006) ("Law schools remain free … to express whatever views they may have on the military's congressionally mandated employment policy"), which would further the State's interest in ensuring that the woman makes an informed decision. *See*, *e.g.*, *Gonzales*, 550 U.S. at 160 ("The State's interest in respect for life is advanced by the dialogue that better informs the political and legal systems, the medical profession, expectant mothers, and society as a whole …."). Accordingly, and contrary to the district court's suggestion, the interests at stake in this case are not of the same order as those discussed in *Wooley* and *Barnette* because North Carolina has not "prescribe[d] what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force[d] citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. As the Ninth Circuit explains, "the First Amendment tolerates a substantial amount of speech regulation within the professional-client relationship that it would not tolerate outside of it. And that toleration makes sense: When professionals, by means of their state-issued

23

licenses, form relationships with clients, the purpose of those relationships is to advance the welfare of the clients, rather than to contribute to public debate." *See Pickup*, 740 F.3d at 1228.[9]  Like Ohio, North Carolina simply has determined what disclosures are required, but only in the sphere of communications between a physician and a woman seeking an abortion and only with respect to truthful, non-misleading information designed to "reduc[e] the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed." *Casey*, 505 U.S. at 882.

Moreover, just like in *Zauderer* and *Casey*, North Carolina's disclosure requirements "implicate" the First Amendment rights of the speakers but do not trigger strict scrutiny given the context. [10]  Instead, consistent with *Zauderer* and

---

[9] *See also* Robert C. Post, *Democracy, Expertise, and Academic Freedom* 24 (2012) ("Within public discourse, the First Amendment requires law to respect the autonomy of speakers rather than to protect the targets of speech; outside public discourse, the First Amendment permits the state to control the autonomy of speakers in order to protect the dignity of the targets of speech.").

[10] Under the district court's analysis, strict scrutiny must apply to all compelled physician disclosures, undermining North Carolina's long-recognized ability to regulate the practice of medicine.  *See, e.g.*, N.C. Gen. Stat. § 130A-215.5 (requiring disclosure of information about breast density and increased cancer risk regardless of whether disclosure would result in psychological harm).  If, on the other hand, the district court's holding is confined to abortion-related disclosures, it has done precisely what it accused the Fifth and Eighth Circuits of doing: "creating … an entirely new category of abortion-related [medical practice regulation] to which a unique standard of review applies."  *Stuart*, 2014 WL 186310, at *17.

*Casey*, only rational basis review applies because the speakers' "rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest." *Zauderer*, 471 U.S. at 651.[11]  In *Zauderer*, that interest was in preventing deception of consumers in the commercial speech context.  In the present case, as discussed above, North Carolina's interests are in protecting the psychological well-being of the woman contemplating an abortion and advancing the State's interest in promoting childbirth over abortion.  Where, as here, the information is truthful, non-misleading, and relevant to the State's interests, *Zauderer* and *Casey* confirm that North Carolina may require "the physician [to] provide the information mandated."  *Casey*, 505 U.S. at 884

**III.    Under the Fourth Circuit's professional speech doctrine, North Carolina's speech-and-display law is constitutional because it is a legitimate and reasonable regulation of the medical profession.**

Upholding North Carolina's speech-and-display provision is entirely consistent this Court's treatment of professional speech under the First Amendment.  In *Bowman*, this Court upheld as a valid regulation of the accounting profession a Virginia law that barred unlicensed accountants from using certain

---

[11] *See also Casey*, 505 U.S. at 885, recognizing that reasonable disclosures aimed at informed consent satisfy rational basis review: "The idea that important decisions will be more informed and deliberate if they follow some period of reflection does not strike us as unreasonable, particularly where the statute directs that important information become part of the background of the decision."

terms in reports, which were prepared for clients and directed at third parties.[12]   In

*Bowman*, this Court explained that strict scrutiny does not apply to professional

regulations even when they restrict speech.   *See also Moore-King*, 708 F.3d at 569

(the government can … regulate those who provide services to their clients for

compensation without running afoul of the First Amendment").   The critical

distinction is between professional speech and speech directed at the public.   *See*

*Moore-King*, 708 F.3d at 569 ("[T]he relevant inquiry to determine whether to

apply the professional speech doctrine is whether the speaker is providing

personalized advice in a private setting to a paying client or instead engaged in

public discussion and commentary.   Professional speech analysis applies in the

former context…."").   And, as this Court noted in *Bowman*, "[t]he key to

distinguishing between occupational regulation and abridgement of first

amendment liberties is in finding 'a personal nexus between professional and

client.'"   *Bowman*, 860 F.2d at 604 (citation omitted).   This Court found such a

nexus in *Bowman* because the non-licensed accountants were "exercis[ing] their

professional judgment in making individualized assessments of each client's

financial situation."   *Id.*   Consequently, while the Virginia statute restricted speech

---

[12]   The district court characterizes *Bowman* as addressing only professional
licensing.   *See Stuart*, 2014 WL 186310, at *7 n.15.   In fact, the case deals directly
with the regulation of professional *speech*.   *See Bowman*, 860 F.2d at 605 ("The
statute in question restricts only accountants' communications with and on behalf
of their clients, as a means of regulating the professional activities of non-CPAs.").

directed at both clients and third parties, it did not violate the First Amendment because the speech was not directed to the public.  *See id.* ("While the information compiled by accountants and bookkeepers may be directed at third parties, it is not aimed at the general public.").

Like the accountants in *Bowman*, physicians who perform abortions offer individualized medical advice to and have a personal nexus with their patients.  *See Stuart*, 2014 WL 186310, at *4 ("Physicians are charged with duties . . . to act in the patient's individual interest as defined by the patient….").  Indeed, a physician "takes the affairs of a [patient] personally in hand and purports to exercise judgment on behalf of the [patient] in light of the [patient]'s individual circumstances."  *Bowman*, 860 F.2d at 604 (citation omitted).  North Carolina's speech-and-display provision, therefore, easily fits within the confines of the professional speech doctrine because it (1) requires physicians to deliver truthful and nonmisleading information solely within the context of offering individualized medical advice and (2) does not compel any speech directed to the general public. *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011) ("There is a difference, for First Amendment purposes, between regulating professionals' speech to the public at large versus their direct, personalized speech with clients.  Florida's license requirement regulates solely the latter....  [I]t does not implicate constitutionally protected activity under the First Amendment.").  As a result, North Carolina may

regulate the speech between physicians and patients because under the professional speech doctrine North Carolina's speech-and-display provision "amount[s] to the permissible regulation of a profession, not an abridgment of speech protected by the first amendment." *Bowman*, 860 F.2d at 605.

## CONCLUSION

For the reasons set forth above, this Court should reverse the district court and hold, consistent with *Casey*, *Whalen*, and this Court's professional speech doctrine, that North Carolina's speech-and-display provision is a valid exercise of the State's authority to regulate the medical profession.


Respectfully submitted,


/s/ Scott W. Gaylord
Scott W. Gaylord
Thomas J. Molony
ELON UNIVERSITY LAW SCHOOL
201 North Greene Street
Greensboro, North Carolina  27401
Phone:  (336) 279-9200
Email:  sgaylord@elon.edu
        tmolony@elon.edu

*Counsel for Amici Curiae*

May 8, 2014

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that:

1.    This brief has been prepared with Microsoft Word, using a proportionally spaced serif typeface, Times New Roman, 14 point font.

2.    Exclusive of: table of contents; table of authorities; any addendum containing statutes, rules, or regulations; and the certificate of service this brief contains 6,963 words.

3.    I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and/or copy of the word or line printout.


<u>/s/ Scott W. Gaylord</u>
Scott W. Gaylord
Thomas J. Molony
ELON UNIVERSITY LAW SCHOOL
201 North Greene Street
Greensboro, North Carolina  27401
Phone:  (336) 279-9200
Email:  sgaylord@elon.edu
          tmolony@elon.edu

*Counsel for Amici Curiae*

## CERTIFICATE OF FILING AND SERVICE

On the 8th day of May, 2014, I filed the required copies of the foregoing Brief of Amici Curiae North Carolina House of Representatives with the Clerk of Court via hand delivery and electronically using the CM/ECF system, which will send a notice of electronic filing to all counsel of record:

/s/ Scott W. Gaylord
Scott W. Gaylord
Thomas J. Molony
ELON UNIVERSITY LAW SCHOOL
201 North Greene Street
Greensboro, North Carolina  27401
Phone:  (336) 279-9200
Email:  sgaylord@elon.edu
          tmolony@elon.edu

*Counsel for Amici Curiae*