NO. 14-1150

# United States Court of Appeals

*for the*

# Fourth Circuit

———————◆———————

GRETCHEN S. STUART, MD, on behalf of herself and her patients seeking abortions; JAMES R. DINGFELDER, MD, on behalf of himself and his patients seeking abortions; DAVID A. GRIMES, MD, on behalf of himself and his patients seeking abortions; AMY BRYANT, MD, on behalf of herself and her patients seeking abortions; SERINA FLOYD, MD, on behalf of herself and her patients seeking abortions; DECKER & WATSON, INC., d/b/a Piedmont

*(For Continuation of Caption See Inside Cover)*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA AT GREENSBORO
AT CASE NO. 1:11-CV-00804-CCE-LPA
CATHERINE C. EAGLES, U.S. DISTRICT COURT JUDGE

## BRIEF FOR PLAINTIFFS-APPELLEES

CHRISTOPHER BROOK
AMERICAN CIVIL LIBERTIES UNION OF
    NORTH CAROLINA LEGAL FOUNDATION
P.O. Box 28004
Raleigh, North Carolina 27611
(919) 834-3466

ANDREW D. BECK
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street
New York, New York 10004
(212) 284-7318

JULIE RIKELMAN
JENNIFER SOKOLER
CENTER FOR REPRODUCTIVE RIGHTS
120 Wall Street, 14th Floor
New York, New York 10005
(917) 637-3670

WALTER DELLINGER
ANTON METLITSKY
LEAH GODESKY
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300

*Attorneys for Plaintiffs-Appellees*

*(For Continuation of Appearances See Inside Cover)*

Carolina Medical Clinic; PLANNED PARENTHOOD OF CENTRAL NORTH
CAROLINA; A WOMAN'S CHOICE OF RALEIGH, INC.;PLANNED
PARENTHOOD HEALTH SYSTEMS, INC.; TAKEY CRIST, on behalf of
himself and his patients seeking abortions; TAKEY CRIST, M.D., P.A., d/b/a
Crist Clinic for Women,

*Plaintiffs-Appellees,*

– v. –

PAUL S. CAMNITZ, MD, in his official capacity as President of the North
Carolina Medical Board and his employees, agents and successors; ROY
COOPER, in his official capacity as Attorney General of North Carolina and his
employees, agents and successors; ALDONA ZOFIA WOS, in her official
capacity as Secretary of the North Carolina Department of Health and Human
Services and her employees, agents and successors; JIM WOODALL, in his
official capacity as District Attorney ("DA") for Prosecutorial District ("PD")
15B and his employees, agents and successors; LEON STANBACK, in his
official capacity as DA for PD 14 and his employees, agents and successors;
DISTRICT ATTORNEY DOUGLAS HENDERSON, in his official capacity as
DA for PD 18 and his employees, agents and successors; BILLY WEST, in his
official capacity as DA for PD 12 and his employees, agents and successors; C.
COLON WILLOUGHBY, JR., in his official capacity as DA for PD 10 and his
employees, agents and successors; BENJAMIN R. DAVID, in his official
capacity as DA for PD 5 and his employees, agents and successors; ERNIE LEE,
in his official capacity as DA for PD 4 and his employees, agents and successors;
JIM O'NEILL, in his official capacity as DA for PD 21 and his employees,
agents and successors,

*Defendants-Appellants.*

DIANA O. SALGADO
PLANNED PARENTHOOD FED. OF
  AMERICA
434 W. 33rd Street
New York, New York 10001
(212) 541-7800

HELENE T. KRASNOFF
PLANNED PARENTHOOD FED. OF
  AMERICA
1110 Vermont Avenue N.W., Suite 300
Washington, D.C. 20005
(202) 978-4800

*Attorneys for Plaintiffs-Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 14-1150          Caption: Gretchen S. Stuart, MD, et al vs. Janice E. Huff, MD, et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

A Woman's Choice of Raleigh, Inc.
(name of party/amicus)


who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?                ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:



3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?     ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Christopher A. Brook          Date: ___March 3, 2014___

Counsel for: Appellee

## CERTIFICATE OF SERVICE
*****************************

I certify that on ___March 3, 2014___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Christopher A. Brook                              March 3, 2014
        (signature)                                        (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 14-1150        Caption: Gretchen S. Stuart, MD, et al vs. Janice E. Huff, MD, et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

Amy Bryant, MD
(name of party/amicus)

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                          ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                      ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Christopher A. Brook          Date: ___March 3, 2014___

Counsel for: Appellee

# CERTIFICATE OF SERVICE
****************************

I certify that on ___March 3, 2014___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Christopher A. Brook          March 3, 2014
_____(signature)_____          _____(date)_____

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  14-1150          Caption:  Gretchen S. Stuart, MD, et al vs. Janice E. Huff, MD, et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

Takey Crist, M.D., P.A., d/b/a Crist Clinic for Women
(name of party/amicus)


who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Christopher A. Brook                    Date: ____March 3, 2014____

Counsel for: Appellee

## CERTIFICATE OF SERVICE
****************************

I certify that on ___March 3, 2014___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Christopher A. Brook                       March 3, 2014
(signature)                                   (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1150__        Caption: __Gretchen S. Stuart, MD, et al vs. Janice E. Huff, MD, et al__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Takey Crist, MD__
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent
        corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                        ☐ YES ☑ NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Christopher A. Brook _____    Date: ___ March 3, 2014 ___

Counsel for: Appellee _____

## CERTIFICATE OF SERVICE
***************************

I certify that on ___ March 3, 2014 ___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Christopher A. Brook _____    ___ March 3, 2014 ___
(signature)                                     (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 14-1150          Caption: Gretchen S. Stuart, MD, et al vs. Janice E. Huff, MD, et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

Decker & Watson, Inc., d/b/a Piedmont Carolina Medical Clinic
(name of party/amicus)


who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO


2.   Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
     If yes, identify all parent corporations, including grandparent and great-grandparent corporations:



3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
     If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Christopher A. Brook                    Date: March 3, 2014

Counsel for: Appellee

## CERTIFICATE OF SERVICE
****************************

I certify that on ___March 3, 2014___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Christopher A. Brook                         March 3, 2014
        (signature)                                  (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1150__        Caption: __Gretchen S. Stuart, MD, et al vs. Janice E. Huff, MD, et al__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__James R. Dingfelder, MD__
(name of party/amicus)


who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?                            ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Christopher A. Brook                    Date:    March 3, 2014

Counsel for: Appellee

## CERTIFICATE OF SERVICE
**************************

I certify that on    March 3, 2014    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Christopher A. Brook                         March 3, 2014
        (signature)                                  (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. _14-1150_    Caption: _Gretchen S. Stuart, MD, et al vs. Janice E. Huff, MD, et al_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_David A. Grimes, MD_
(name of party/amicus)


who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.    Does party/amicus have any parent corporations?  ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Christopher A. Brook _____    Date: ___ March 3, 2014 ___

Counsel for: Appellee _____

## CERTIFICATE OF SERVICE
****************************

I certify that on ___ March 3, 2014 ___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Christopher A. Brook _____         ___ March 3, 2014 ___
(signature)                                              (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. _14-1150_        Caption: _Gretchen S. Stuart, MD, et al vs. Janice E. Huff, MD, et al_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Planned Parenthood Health Systems, Inc._
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                            ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Christopher A. Brook                    Date:      March 3, 2014

Counsel for: Appellee

## CERTIFICATE OF SERVICE
*****************************

I certify that on ____ March 3, 2014 ____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

/s/ Christopher A. Brook                              March 3, 2014
        (signature)                                        (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 14-1150        Caption: Gretchen S. Stuart, MD, et al vs. Janice E. Huff, MD, et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

Planned Parenthood of Central North Carolina
(name of party/amicus)


who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?                            ☐ YES ☑ NO
     If yes, identify all parent corporations, including grandparent and great-grandparent corporations:



3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                           ☐ YES ☑ NO
     If yes, identify all such owners:




10/28/2013 SCC                        - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Christopher A. Brook                    Date:    March 3, 2014

Counsel for: Appellee

## CERTIFICATE OF SERVICE
****************************

I certify that on ____March 3, 2014____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

/s/ Christopher A. Brook                         March 3, 2014
(signature)                                      (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 14-1150        Caption: Gretchen S. Stuart, MD, et al vs. Janice E. Huff, MD, et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

Gretchen S. Stuart, MD
(name of party/amicus)

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations? ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Christopher A. Brook                    Date:    March 3, 2014

Counsel for: Appellee

## CERTIFICATE OF SERVICE
****************************

I certify that on    March 3, 2014    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Christopher A. Brook                                        March 3, 2014
_____                                 _____
(signature)                                                              (date)

- 2 -

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iii

PRELIMINARY STATEMENT ......................................................... 1

QUESTION PRESENTED ................................................................ 4

STATEMENT OF THE CASE........................................................... 4

    A.    Abortion In North Carolina And The Physicians' Medical Practice ........................................................................... 5

    B.    The Act ........................................................................ 8

    C.    Proceedings Below .................................................... 15

SUMMARY OF ARGUMENT ...................................................... 17

ARGUMENT ................................................................................. 21

I.    The State's Argument That *Casey* Requires Rational Basis Review Of Any Regulation Compelling Physician Speech In The Abortion Context, Or Any Regulation Of Physician Speech More Generally, Is Meritless........................................................................... 21

    A.    *Casey*'s First Amendment Holding Extends Only To The Particular Informed Consent Provision At Issue In That Case .......... 23

    B.    The State's Proffered Rule That Compelled Speech In The Abortion Or Physician Context Is Automatically Subject Only To Rational Basis Review Finds No Support In *Casey* ...................... 27

        1.    *Casey* Did Not Create An Abortion Exception To The First Amendment.................................................... 27

        2.    *Casey* Did Not Create A Physician Exception To The First Amendment.................................................... 31

II.    The Requirement Violates The Physicians' First Amendment Rights By Compelling Them To Speak The State's Message .................................. 36

    A.    Speech Mandates Like The Requirement Are Subject To Heightened Scrutiny Under Established First Amendment Principles ................................................................ 36

        1.    The Requirement Is Subject To Strict Scrutiny Because It Mandates Ideological Speech ................................... 38

i

**TABLE OF CONTENTS**
(continued)

Page

2.    Even If The Requirement Mandates Non-Ideological "Professional" Speech, It Is Not Shielded From Heightened First Amendment Scrutiny ....................................40

B.    The Requirement Cannot Satisfy Strict or Intermediate Scrutiny ......49

1.    Informed Consent And Preventing Coercion............................51

2.    Persuading Pregnant Women To Forego Abortion .................53

III.    If The Court Believes The Requirement Is Consistent With The First Amendment, It Should Remand For The District Court To Consider The Physicians' Other Challenges To That Provision ..................................55

CONCLUSION ........................................................................................56

CERTIFICATE OF COMPLIANCE .....................................................57

APPENDIX A ...........................................................................................1a

**TABLE OF AUTHORITIES**

Page

CASES

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l Inc.*,
   133 S. Ct. 2321 (2013)........................................................36

*Axson-Flynn v. Johnson*,
   356 F.3d 1277 (10th Cir. 2004) ................................. 30, 37

*Brown v. Entm't Merchants Ass'n*,
   131 S. Ct. 2729 (2011)........................................................45

*Canterbury v. Spence*,
   464 F.2d 772 (D.C. Cir. 1972)...........................................47

*Centro Tepeyac v. Montgomery Cnty.*,
   722 F.3d 184 (4th Cir. 2013) ..................................... 30, 37

*City of Akron v. Akron Ctr. for Reproductive Health, Inc.*,
   462 U.S. 416 (1983)............................................................25

*Conant v. Walters*,
   309 F.3d 629 (9th Cir. 2002) ..................................... 32, 44

*FCC v. Pacifica Found.*,
   438 U.S. 726 (1978)..................................................... 48, 49

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006)............................................................46

*Gonzales v. Carhart*,
   550 U.S. 124 (2007)............................................................31

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City
   Council of Balt.*,
   721 F.3d 264 (4th Cir. 2013) ..................................... 33, 48

*Hersh v. United States*,
   553 F.3d 743 (5th Cir. 2008) ..................................... 30, 37

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
   515 U.S. 557 (1995).......................................... 36, 37, 38

# TABLE OF AUTHORITIES
## (continued)

Page

*Lee v. Weisman*,
505 U.S. 577 (1992)...........................................................48

*LSC v. Velazquez*,
531 U.S. 533 (2001)...........................................................45

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*,
474 F.3d 477 (7th Cir. 2007) .............................................48

*Moore-King v. Cnty. of Chesterfield*,
708 F.3d 560 (4th Cir. 2013) ........................... 16, 41, 42, 46

*Nat'l Ass'n of Mfrs. v. NLRB*,
717 F.3d 947 (D.C. Cir. 2013)................................... 40, 41

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978)...........................................................35

*Pickup v. Brown*,
728 F.3d 1042 (9th Cir. 2013) .................................... 16, 42

*Pickup v. Brown*,
740 F.3d 1208 (9th Cir. 2014) ............................... 42, 43, 44

*Planned Parenthood Minn., N.D., S.D. v. Rounds*,
686 F.3d 889 (8th Cir. 2012) ............................................28

*Planned Parenthood v. Abbott*,
748 F.3d 583 (5th Cir. 2014) ............................................31

*Planned Parenthood v. Casey*,
505 U.S. 833 (1992)................................................. passim

*Planned Parenthood v. Casey*,
947 F.2d 682 (3d Cir. 1991) ...................................... 24, 25

*R.J. Reynolds Tobacco Co. v. FDA*,
696 F.3d 1205 (D.C. Cir. 2012)........................................38

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
  487 U.S. 781 (1988) ................................................................................ passim

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) .................................................................................34

*Sorrell v. IMS Health Inc.*,
  131 S. Ct. 2653 (2011) ........................................................................ 16, 50

*Stuart v. Huff*,
  706 F.3d 345 (4th Cir. 2013) ..................................................................15

*Stuart v. Huff*,
  834 F. Supp. 2d 424 (M.D.N.C. 2011) .................................... 15, 29, 34

*Stuart v. Loomis*,
  No. 1:11-CV-804, 2014 WL 186310 (M.D.N.C. Jan. 17, 2014)............... passim

*Texas Medical Providers Performing Abortion Servs. v. Lakey*,
  667 F.3d 570 (5th Cir. 2012) ........................................... 18, 27, 28, 30

*Thompson v. W. States Med. Ctr.*,
  535 U.S. 357 (2002) .......................................................................... 50, 53

*Turner Broad. Sys. v. FCC*,
  512 U.S. 662 (1994) .......................................................................... 50, 52

*United States v. Alvarez*,
  132 S. Ct. 2537 (2012) ...................................................................... 37, 45

*United States v. Stevens*,
  559 U.S. 460 (2010) .................................................................................46

*United States v. Williams*,
  553 U.S. 285 (2008) .................................................................................29

*Whalen v. Roe*,
  429 U.S. 589 (1977) .................................................................................26

## TABLE OF AUTHORITIES
### (continued)

Page

*Wollschlaeger v. Farmer*,
   880 F. Supp. 2d 1251 (S.D. Fla. 2012) ........................................................ 32, 44

*Wooley v. Maynard*,
   430 U.S. 705 (1977) ................................................................... 26, 32, 54

STATUTES

29 U.S.C. § 158 ................................................................................................. 41

N.C.G.S. § 90-14 .............................................................................................. 10

N.C.G.S. § 90-21.13 ........................................................................................... 6

N.C.G.S. § 90-21.81 ......................................................................................... 10

N.C.G.S. § 90-21.82 .................................................................................. 8, 9, 24

N.C.G.S. § 90-21.85 .................................................................................. passim

N.C.G.S. § 90-21.86 ......................................................................................... 10

N.C.G.S. § 90-21.88 ......................................................................................... 10

18 Pa. Cons. Stat. § 3205 ........................................................................... 23, 24

ADMINISTRATIVE MATERIALS

10A N.C. Admin. Code 14E.0305 ..................................................................... 6, 7

OTHER AUTHORITIES

Comm. on Ethics, Am. Coll. Of Obstetricians & Gynecologists,
   *Comm. Op. # 439: Informed Consent* 7 (2009, reaffirmed 2012) ...................... 7

Richard E. Shugrue & Kathryn Linstromberg, *The Practitioner's*
   *Guide to Informed Consent*, 24 CREIGHTON L. REV. 881 (1991) ............... 46, 47

## PRELIMINARY STATEMENT

A North Carolina law enacted in 2011 mandates that a physician (or a qualified technician) not only perform an ultrasound on a patient in advance of performing an abortion, but also display and describe the ultrasound image in a manner dictated by the state while the patient is partially undressed on an examination table.  The physician must comply with this speech mandate even when the patient states that she does not want to see the ultrasound image or hear the description, and even when complying would affirmatively harm the patient.  Most remarkably, a physician must continue speaking the state's message even when a patient actively seeks to avoid the compelled speech by closing her eyes and covering her ears, as the statute specifically allows her to do.  The State maintains that the speech mandate is simply an informed consent law, but the statute itself refutes the State's characterization:  the law compels the physician to speak *even if no information is communicated to the patient*.  For that reason, the District Court correctly found that the mandate is performative rather than informative and is not an informed consent law at all.

Contrary to the impression left by the State's opening brief, this case is not about whether the speech mandate imposes an undue burden on a woman's due process right to abortion.  Instead, the only question answered below and challenged on appeal is whether the mandate compels physicians, like Plaintiffs

1

here, to speak against their will in violation of the First Amendment.

The answer is yes. The speech mandate conscripts physicians to promote in their own voice and in a uniquely coercive way the state's ideological interest in, as the State describes it, "persuading pregnant women to opt for childbirth over abortion." State Br. 29. It is fundamental that the state may not compel private speakers to express the government's favored viewpoint. The State says that the mandate compels only factual, non-ideological speech. That is wrong, but even if it were true, it would not matter—the Supreme Court has repeatedly made clear that even compelled factual speech is subject to exacting First Amendment scrutiny, which the mandate does not survive.

The State's principal defense of the speech mandate is the incorrect claim that, in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992), the Supreme Court decided that *all* "challenges to laws that regulate 'the practice of medicine' are subject only to rational basis review," even when they compel physicians to speak the government's message against their will. State Br. 15. The State also relies on a Fifth Circuit decision that adopts this sweeping interpretation of *Casey* and further holds that so long as an abortion restriction does not violate a *woman*'s *due process* right to terminate her pregnancy, a *physician* automatically loses any *First Amendment* challenge to the restriction, regardless of its effect on speech.

If those broad propositions sound inconsistent with ordinary First

Amendment principles, that is because they are—there is no abortion exception to the First Amendment, and the Supreme Court has never suggested, let alone held, that the state can compel physician speech, no matter the type of speech compelled or the regulatory context. In *Casey*, the Supreme Court upheld against a First Amendment challenge a law requiring, *inter alia*, a physician to *offer* to a patient *state-published* materials concerning fetal development, and even then only if the physician believed that doing so would not harm the patient. Neither that case nor any other Supreme Court precedent immunizes from First Amendment scrutiny a state's attempt to compel a physician to speak the state's message in his or her own voice, even when the patient does not want to hear it, even when the patient physically avoids seeing or hearing the compelled message, and even when following the speech mandate would harm the patient and thus force the physician to violate ethical obligations.

The State also relies on precedents from this and other courts concerning "professional speech," but those cases refute the State's contention that the First Amendment does not apply to speech mandates related to "the practice of medicine." Instead, those cases make clear that mandates like the one at issue here are subject to heightened First Amendment scrutiny. And when subjected to such scrutiny, this speech mandate does not stand a chance: it does not legitimately further any substantial state interest, and, even more obviously, it is far broader

3

than necessary to serve any plausible interest. A law that requires a physician to speak even when the speech would affirmatively harm the patient, and *even when the patient is refusing to listen*, cannot be sufficiently tailored to survive under the First Amendment.

## QUESTION PRESENTED

North Carolina General Statute § 90-21.85 requires that at least four hours and no more than 72 hours before performing an abortion, a physician (or qualified technician) must perform an ultrasound on a patient seeking an abortion and, during the ultrasound procedure itself, display the ultrasound image so that the patient may see it and describe it in a manner prescribed by the state. The physician must display and describe the image even when the patient objects, even when complying with the statute would harm the patient, and even when the patient seeks to avoid the state-mandated speech by covering her eyes and ears, as the statute expressly permits her to do.

The question presented is whether N.C.G.S § 90-21.85 compels speech in a manner that deprives the affected physicians of the "freedom of speech" under the First Amendment of the United States Constitution.

## STATEMENT OF THE CASE

Plaintiffs in this case (the "Physicians") include North Carolina obstetrician-gynecologists who practice in a variety of settings, including major hospitals such

4

as the University of North Carolina and Duke University, as well as private clinics.

Joint Appendix ("JA") 786.  The Physicians offer their patients a range of care,

including pregnancy termination for patients who make that decision.  *Id.*

This case concerns the Physicians' First Amendment challenge to the

Display of Real-Time View Requirement ("the Requirement"), N.C.G.S. § 90-

21.85, one provision of the 2011 Woman's Right to Know Act (the "Act").   That

provision imposes uniquely coercive and harmful requirements on how physicians

must speak to and treat their patients.  It requires a physician, during an ultrasound

examination, to display and describe, in his or her own voice, ultrasound images of

the embryo or fetus to a patient seeking an abortion, even if the patient objects,

even if the physician believes following the Requirement will harm the patient, and

even when doing so is against the physician's medical judgment.  The District

Court correctly concluded that the Requirement compels the Physicians' speech in

violation of the First Amendment.

## A.    Abortion In North Carolina And The Physicians' Medical Practice

Abortion is a very safe procedure that women elect for a number of reasons,

"including but not limited to the health of the woman or fetus."  *Stuart v. Loomis*,

No. 1:11-CV-804, 2014 WL 186310, at *4 (M.D.N.C. Jan. 17, 2014).  "The vast

majority of abortions in North Carolina occur during the first trimester of

pregnancy." *Id*. And, "[a]s is true nation-wide, more than 60% of North Carolina women obtaining abortions already have at least one child." JA 786.

Prior to the Act, the Physicians' practice was comparable to that of doctors in other areas of medicine. Pre-existing North Carolina law already required a physician to obtain informed consent from each patient, including abortion patients. N.C.G.S. § 90-21.13(a)(2) (informed consent for medical treatment requires that patient have "a general understanding of the procedures or treatments and of the usual and most frequent risks and hazards inherent in the proposed procedures or treatments"); *see also* 10A N.C. Admin. Code 14E.0305(a) (requiring abortion patient to sign written consent form in physician's presence).

The Physicians' informed consent process was comprehensive and aimed at ensuring that each patient had the information needed to make an autonomous decision whether to terminate a pregnancy. *See Stuart*, 2014 WL 186310, at *4-*5; *see also* JA 326-28, 340, 358-59, 409-11, 427-28, 789-91. Consistent with their ethical and legal obligations, the Physicians and/or their staff informed each patient about the nature of the abortion procedure, its risks and benefits, and the alternatives available to the patient and their respective risks and benefits; they likewise counseled the patient to ensure that she was certain about her decision to have an abortion. *See* JA 326-27, 409-10, 427-28.

6

The Physicians' practice also generally involved asking patients if they wanted to view ultrasound images, showing the images to patients who wanted to see them, and answering questions about the ultrasound.  *See Stuart*, 2014 WL 186310, at *5; *see also* JA 327-28, 411, 429-30, 791.  Thus, *offering* patients the option to view an ultrasound was part of the Physicians' practice even before the Act.[1]

In obtaining informed consent, however, the Physicians followed two traditional principles of medical practice: patient waiver and therapeutic privilege. Thus, consistent with their ethical obligations, the Physicians respected the decisions of those patients who elected not to view the ultrasound images.  *See Stuart*, 2014 WL 186310 at *4 (noting that under traditional informed consent principles, physicians should ordinarily respect patient's decision not to consider some information); Comm. on Ethics, Am. Coll. Of Obstetricians & Gynecologists, *Comm. Op. # 439:  Informed Consent* 7 (2009, reaffirmed 2012) (patient's decision not to receive information is "itself an exercise of choice, and its acceptance can be part of respect for patient's autonomy" and "[i]mplicit in the

---

[1] The Physicians perform ultrasounds on patients seeking an abortion for diagnostic purposes to confirm the pregnancy, determine its location, and to establish the gestational age of the embryo or fetus.  *See* JA 327, 410-11, 428.

An ultrasound is also required by regulation: the same pre-existing North Carolina regulation that requires abortion patients to complete a written consent form also requires an ultrasound to be performed on any patient who is scheduled for an abortion procedure.  *See* 10A N.C. Admin. Code 14E.0305(d).

ethical concept of informed consent is the goal of maximizing a patient's freedoms"); JA 449-51, 481.  And, in rare circumstances, consistent with best medical practices, the Physicians would not offer to display and describe ultrasound images to patients who, in their medical judgment, were at significant risk of suffering psychological harm as a result of the offer itself.  *See Stuart*, 2014 WL 186310, at *4; *id.* at *4 n.12 (summarizing case law and noting that "[i]n other contexts, North Carolina law recognizes the necessity of withholding certain kinds of information from a patient").

### B.    The Act

This appeal concerns only one section of the Act: the Requirement. Nevertheless, the State begins its discussion of the Act by focusing on Section 90-21.82, *see* State's Br. 2-3, which is not at issue here.

Notably, unlike the Requirement, Section 90-21.82 is the only section in the Act actually entitled "Informed consent to abortion."  N.C.G.S. § 90-21.82.  It requires that no abortion be performed without a woman's voluntary and informed consent and that at least 24 hours before the procedure, a physician or qualified professional must inform the woman, *inter alia*, of the particular medical risks associated with the abortion procedure to be employed, the probable gestational age of the embryo or fetus, that medical assistance benefits may be available for prenatal care and childcare, that she has the right to review printed materials

created by the state that provide information about embryonic and fetal

development, *and* that she can view an ultrasound of the embryo or fetus and listen

to any heartbeat, *if she so chooses.* *Id.* §§ 1(b), (c), (e), 2(a), (e).  All of this

section, including the *offer* to the woman to view ultrasound images and listen to

any heartbeat, has been in force since the Act's effective date in 2011, was not

challenged based on its substance by Plaintiffs,[2] and is not at issue in this appeal.

The Requirement, however, is altogether different.  It mandates that the

physician or qualified technician conduct an ultrasound that gives "an obstetric

real-time view of the unborn child" at least four hours before the woman can have

an abortion.  N.C.G.S. §§ 90-21.85(a).  During this ultrasound procedure, the

woman must lie supine on an examination table either (i) naked from the waist

down, covered only by a drape or (ii) with her clothing pulled down to expose the

lower portion of her abdomen.  *See Stuart*, 2014 WL 186310, at *3; JA 327, 411,

428-29, 787.  Depending on the stage of pregnancy, the provider performs the

ultrasound either by inserting an ultrasound probe into the woman's vagina or by

placing the ultrasound probe on her abdomen.  *Stuart*, 2014 WL 186310, at *3; JA

327, 411, 428-29.

---

[2] Part of this section was the subject of a vagueness challenge by the
Physicians, but the District Court resolved this challenge through a savings
construction, and the Physicians have not appealed from that ruling.  *See infra* at n.
7.

The Requirement dictates that in the midst of the ultrasound procedure, the physician or qualified technician must:

- "[d]isplay the images so that the pregnant woman may view them," § 90-21.85(a)(3);

- provide a simultaneous, detailed "explanation of what the display is depicting," including "the presence, location, and dimensions" of the embryo or fetus within the uterus, § 90-21.85(a)(2); and

- provide a "medical description of the images . . . [including] the dimensions of the embryo or fetus and the presence of external members and internal organs, if present and viewable." § 90-21.85(a)(4).

The only exception to the Requirement is for medical emergencies. §§ 90-21.85(a), 90-21.86.[3]

Thus, the Requirement compels the Physicians, using their own voice, to display and describe ultrasound images to a woman in a manner mandated by the state or face civil penalties and loss of medical licensure. *See* N.C.G.S. §§ 90-21.88, 90-14(a)(2). The Physicians must display and describe these images *while*

---

[3] A "medical emergency" is defined as a "condition which, in reasonable medical judgment, so complicates the medical condition of the pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible physical impairment of a major bodily function, *not including any psychological or emotional conditions*." N.C.G.S. § 90-21.81(5) (emphasis added). The statute clarifies that "no condition shall be deemed a medical emergency if based on a claim or diagnosis that the woman will engage in conduct which would result in her death or in substantial and irreversible physical impairment of a major bodily function." *Id.*

10

the woman "is in essence captive, under [the physician's] control."  JA 333; *see also Stuart*, 2014 WL 186310, at *3.  The Physicians must describe these images regardless of the woman's reason for choosing to terminate her pregnancy (including in cases of rape and incest), even if the woman objects, even if the physician believes it will harm her and violate medical ethics, and even when doing so is contrary to the physician's medical judgment.  *See* N.C.G.S. § 90-21.85; *Stuart*, 2014 WL 186310, at *3; JA 331-32, 339-41, 413-16, 429-33.

Most absurdly, the Physicians must display and describe the ultrasound images even if the woman attempts to resist physically, with the Requirement expressly assuring that it should not be interpreted "to prevent a pregnant woman from averting her eyes from the displayed images or from refusing to hear" the doctor's rendition of the state's script.  N.C.G.S. § 90-21.85(b); *see Stuart*, 2014 WL 186310, at *3.  Indeed, a physician may even give "eye blinders and headphones" to a woman who does not want to see or hear the ultrasound images and description, but must nevertheless continue to describe and display the image to a woman who attempts not to hear it.  *Stuart*, 2014 WL 186310, at *3; *see also* JA 483-84, 787.  Under the Requirement, "[a] woman who does not watch or listen

11

to the real-time display and description can still give [legally valid] informed consent to an abortion." *Stuart*, 2014 WL 186310, at *3.[4]

The evidence in the District Court established that the Requirement forces the Physicians to act in numerous ways that contravene medical ethics and fundamental principles of informed consent. First, physicians have an ethical obligation to avoid harming their patients. JA 363, 390-91, 452-53, 794-95. But as the District Court found, "[i]t is undisputed that some women . . . are at risk of suffering serious and lasting psychological or emotional harm if they watch the display and hear the description in the inflexible mode and manner required [by the Act] especially if the message is delivered without their consent or over their objection." *Stuart*, 2014 WL 186310, at *12 n.32; JA 332-33, 413-14, 432-33, 537-39, 797-98. The Requirement may be especially harmful for patients who are seeking abortions because of fetal anomalies, maternal health indications, or in cases of rape or incest. *See* JA 332-33, 413-14, 432-33, 537-38, 797-98. One patient subjected to a similar Texas mandate described it as "nothing short of torture." JA 528 (testimony of woman who sought an abortion due to a significant

---

[4] The State does not (and cannot) dispute that the Requirement expressly allows a woman to avoid speech by "averting her eyes" and "refusing to hear." It does not, however, believe that a woman should avail herself of that statutory right, but instead "should 'be a man about it' and 'hear what is not pleasant to hear.'" *Stuart*, 2014 WL 186310, at *12 n.34 (quoting statements at oral argument by State's counsel).

fetal anomaly).

Moreover, "forcing at-risk patients to cover their eyes and ears to avoid receiving the message does not remove the potential for serious psychological harm. In fact, the uncontroverted evidence is that performing the procedure while the patient resists *is* harmful." *Stuart*, 2014 WL 186310, at *12 n.35 (emphasis added); *see also* JA 538. As the District Court explained, "[i]t seems unexceptionable to conclude, for example, that serious psychological harm could result from requiring a woman who became pregnant as a result of rape to lie half-undressed with a vaginal probe inside her while she listens to an unwanted message from a medical professional who has refused to listen to her wishes, especially if she were blindfolded to avoid that message." *Stuart*, 2014 WL 186310, at *12 n.35.

Second, the State agreed that medical ethics generally require that a physician not act over the objection of a competent patient. JA 481, 794. But that is precisely what the Requirement mandates: it compels the Physicians to speak and display even over the patient's objection, therefore violating this basic tenet of medical practice. JA 326-27, 358, 362, 389-90, 415-16, 449.

Third, the State agreed that *all* physicians in North Carolina have an ethical obligation to exercise their medical judgment and discretion, and to practice medicine based on the specific needs of an individual patient. JA 792; *see also* JA

13

339, 388-89, 454-55.  Part of this discretion includes the ability "to choose in what way they obtain their informed consent from their patients," as the State's own expert conceded.  JA 482, 490.  But the Requirement gives providers no discretion on how to provide information to patients, when to do so, and what to say.

In sum, while the State pretends that the Requirement is simply an informed consent provision, there is a reason a *different* portion of the Act is entitled "informed consent to abortion":  the Requirement is inconsistent with principles of informed consent and "undermines well-established professional norms in the medical field, without empirical justification."  *Stuart*, 2014 WL 186310, at *16.  The Requirement does not merely require physicians to offer their patients the ability to view an ultrasound and hear its description; it mandates physicians to speak and display the state's message even over a patient's objection, regardless of any harm to her, and even if she actively refuses to see and hear.  As the District Court concluded based on uncontroverted evidence, "informed consent is not improved and no medical purpose is served" when a physician displays and describes the ultrasound images to a patient who has taken steps to avoid seeing the images or hearing the description.  *Id.* at *3; JA 798-99.[5]

---

[5] When the State's expert, Dr. Watson A. Bowes, was asked how the Requirement improves informed consent when a physician continues speaking to a patient who has turned her head or covered her ears, he conceded that "[i]t doesn't."  JA 489.  The State could not refute this admission but attempted to claim

14

### C.    Proceedings Below

Based in large part on the Requirement's onerous speech mandate, the Physicians filed this action in September 2011 and immediately sought a preliminary injunction.  On December 19, 2011, the District Court preliminarily enjoined the Requirement after concluding that the Physicians were "likely to succeed on the merits of the[ir] First Amendment challenge."  *Stuart v. Huff*, 834 F. Supp. 2d 424, 427 (M.D.N.C. 2011).[6]

After a period of discovery, the parties cross-moved for summary judgment. On January 17, 2014, in a detailed, forty-two-page memorandum opinion and order, the district court granted in part the Physicians' motion for summary judgment and permanently enjoined the Requirement as violating their First Amendment rights.  *Stuart*, 2014 WL 186310, at *1.

The court explained that the "First Amendment generally prohibits the government from requiring people to speak its messages."  *Id.* at *5.  And although the court acknowledged that states could in some circumstances compel the speech

---

it was immaterial in response to Plaintiffs' Statement of Undisputed Facts.  JA 798-99.  The District Court correctly found this point was undisputed *and* material. *Stuart*, 2014 WL 186310, at *3.

[6] After the District Court's order preliminarily enjoining the Requirement, several individuals and groups sought to intervene in support of the State.  The District Court denied that motion, *see Stuart v. Huff*, No. 1:11-cv-804, 2011 WL 6740400 (M.D.N.C. Dec. 22, 2011), and this Court affirmed, *see* 706 F.3d 345 (4th Cir. 2013).

of professionals as part of their general occupational-regulatory authority, *id.* at *7-*9, the court also held that the Requirement is subject to heightened scrutiny, for at least two reasons.  First, because the Requirement mandates that providers, in their own voice, "deliver a message designed to persuade women not to terminate a pregnancy, which the State forthrightly acknowledges is one of its purposes, it 'imposes burdens that are based on the content of speech and that are aimed at a particular viewpoint.'"  *Id.* at *10 (quoting *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2663-64 (2011)).  Second, relying on professional speech precedent, the court explained that heightened scrutiny is required because the "state is seeking to compel 'doctor-patient communications *about* medical treatment,' and to create a new professional norm in a highly regulated field where providers are educated specialists with significant training and expertise and who are already licensed by the state."  *Id.* (quoting *Pickup v. Brown*, 728 F.3d 1042, 1053 (9th Cir. 2013), and citing *Moore-King v. Cnty. of Chesterfield*, 708 F.3d 560, 570 (4th Cir. 2013)). "There may be minimal First Amendment concerns when the state compels compliance with standards of acceptable and prevailing medical practice," the court explained, "but when the state seeks to compel speech outside those prevailing practices, the issue is quite different."  *Id.* (internal quotation marks and citation omitted).

Applying heightened scrutiny, the court invalidated the Requirement.  The

16

court explained that the Requirement compels "providers to deliver the state's message to women who take steps not to hear it and to women who will be harmed by receiving it with no legitimate purpose. Thus, it is overbroad, and it does not directly advance the state's interests in reducing psychological harm to women or in increasing informed and voluntary consent." *Id.* at *18. Moreover, "[t]o the extent the Act requires providers to deliver the state's message designed to discourage abortion, it is an impermissible attempt to compel these providers to deliver the state's message in favor of childbirth and against abortion." *Id.* Accordingly, the court held, "Plaintiffs are entitled to summary judgment."[7] *Id.*

This appeal followed.

## SUMMARY OF ARGUMENT

The Requirement forces the Physicians to speak the state's message—to display a patient's ultrasound image and describe it in a manner dictated by the state—even when the patient does not want to see it or hear it, even when complying with the Requirement would harm the patient, and even when the patient tries to avoid the speech by shutting her eyes and covering her ears. The

---

[7] Having found that the Requirement violates the Physicians' First Amendment rights, the District Court declined to consider whether the provision also fails substantive due process because it is irrational. *Stuart*, 2014 WL 186310, at *19. The District Court also rejected the Physicians' vagueness claim after accepting the State's proposed savings construction (to which the Physicians agreed). *Id.*

Requirement is a speech mandate that should be subjected to heightened scrutiny, which it cannot meet.

The State does not dispute that government speech mandates—even those compelling only "factual" speech—are ordinarily subject to heightened First Amendment scrutiny. Rather, it argues that the Court should discard ordinary First Amendment principles in this case because the Supreme Court's decision in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992), adopted a special rule under which the Requirement is subject only to rational basis review. In particular, the State presses the erroneous reading of *Casey* adopted by the Fifth Circuit in *Texas Medical Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570 (5th Cir. 2012), under which a state may compel speech regulating abortion so long as the challenged law is rational and does not impose an undue burden on a woman's due process right to abortion. The State also presses an even broader rule it purports to derive from *Casey*, under which any government speech mandate is subject only to rationality review so long as it regulates the "practice of medicine."

*Casey* supports neither rule. It involved a Pennsylvania informed consent statute entirely unlike the Requirement. Most relevant to the First Amendment challenge in that case, the Pennsylvania statute merely required physicians to *offer* to their patients the opportunity to view state-published pamphlets concerning fetal development (i.e., the *state's* own speech). Moreover, the statute allowed

18

physicians to waive compliance with this requirement if they believed it would harm their patients.  *Casey* rejected both the patients' due process challenge and the physicians' First Amendment challenge to this statute, but its analysis makes clear that its First Amendment holding was limited to the particular law at issue there.  Thus, *Casey* stands only for the proposition that a state law requiring a physician to offer to a patient the opportunity to view the state's speech (subject to physician override if it would harm the patient) is subject to rational basis review under the First Amendment.

Indeed, *Casey* merely confirms the fundamental principle that the level of First Amendment scrutiny turns on the nature and context of the speech mandate at issue.  And the informed consent provision upheld in *Casey* is nothing like the Requirement.

Although the State insists that the Requirement is just an informed consent law, the Requirement actually violates basic principles of informed consent because it fails to allow for patient waiver or the exercise of therapeutic privilege by the physician, both of which were permitted under the statute in *Casey*.  Indeed, the absurd nature of the Requirement completely undermines the State's argument that the provision is nothing more than an informed consent law.  As the State conceded below, a woman can wear "blinders" on her eyes to prevent her from seeing and "earphones" to prevent her from hearing while the physician displays

19

and describes the images, and yet can still give legally valid informed consent to an abortion.

Analyzing the unique nature of the speech mandated here, the District Court rightly found that the Requirement compels ideological speech. It commandeers unwilling physicians to use their own voice and expressive conduct to communicate the state's message against abortion. And it commandeers physicians to convey this message in a uniquely intrusive way—during a medical procedure while the patient is vulnerable and disrobed on an examination table with an ultrasound probe inside or on her. Further, it compels physicians to force the state's message on a patient even as she struggles to close her eyes, cover her ears, and avoid the speech. To ignore the ideological nature of this speech and the context in which this speech must take place is to ignore the reality of what the state would compel physicians to say and do. Because it compels ideological speech, the Requirement is subject to strict scrutiny, which it fails.

But even if the Court chooses not to reach the question of whether the Requirement compels speech that is ideological, it should apply heightened scrutiny and uphold the injunction. The Supreme Court has repeatedly held that, but for narrow exceptions not at issue here, compelled speech triggers heightened review under the First Amendment, regardless of whether it is ideological. Further, contrary to the State's position, the Supreme Court has rejected arguments

20

that rational basis review applies whenever a government compels speech by a professional in his or her professional capacity; instead, it has repeatedly applied heightened scrutiny to regulations of professional speech as well. In particular, the Supreme Court has indicated that when a law interferes with the basic function of the profession, as the Requirement does by perverting the traditional role of a physician in the physician-patient relationship, it must be subjected to heightened scrutiny.

The Requirement fails such scrutiny because far less intrusive means of serving any state interest are readily available. Indeed, a law justified as serving the state's interest in informed consent cannot be sufficiently tailored to promote that interest if it requires a physician to speak the state's message even when the patient is actively blocking out the speech. Accordingly, the Requirement violates the First Amendment.

## ARGUMENT

**I.** **The State's Argument That *Casey* Requires Rational Basis Review Of Any Regulation Compelling Physician Speech In The Abortion Context, Or Any Regulation Of Physician Speech More Generally, Is Meritless**

Under traditional First Amendment principles, a speech mandate like the Requirement should be subjected, at a minimum, to heightened scrutiny. *See infra* at Part II. The State argues, however, that traditional First Amendment principles must be discarded in this case, and that the Requirement should be upheld so long

21

as it satisfies rational basis review.  Accepting the State's argument would create not only an abortion exception but also a physician exception to the First Amendment unsupported by any Supreme Court precedent.  The State is wrong, and the Court should reject its position.

The State's argument is based almost entirely on an erroneous reading of *Casey*, which upheld a qualitatively different and far less coercive provision than the Requirement against a First Amendment challenge.  *Casey* itself provides no support for the State's sweeping claims about how the decision changed fundamental First Amendment doctrine.  Instead, consistent with the established principles that context is crucial to First Amendment analysis and that the level of scrutiny turns on "the nature of the speech taken as a whole and the effect of the compelled statement thereon," *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796 (1988), *Casey* held only that the specific Pennsylvania informed consent provision at issue *in that case* was not subject to heightened scrutiny.  It did not downgrade to rational basis review *any* speech mandate so long as it regulates abortion, or so long as it regulates physicians more generally, no matter how repugnant the mandate is to core First Amendment principles.  The Requirement is nothing like the informed consent provision upheld in *Casey*, and the Court cannot review the Physician's First Amendment challenge to it under the rational basis standard without gutting First Amendment protections and jeopardizing the

22

physician's trusted role in the physician-patient relationship.

**A.    *Casey*'s First Amendment Holding Extends Only To The Particular Informed Consent Provision At Issue In That Case**

Ignoring that the "nature" and context of compelled speech is vital to the appropriate level of First Amendment scrutiny, the State glosses over the details of *Casey*.  But understanding the scope of *Casey*'s First Amendment holding requires understanding the statute challenged in that case, 18 Pa. Cons. Stat. § 3205, and the claims lodged against it.

Section 3205 required that "[e]xcept in a medical emergency . . .  at least 24 hours before performing an abortion a physician inform the woman of the nature of the procedure, the health risks of the abortion and of childbirth, and the 'probable gestational age of the unborn child.'"  *Casey*, 505 U.S. at 881.  It also required that "[t]he physician or a qualified nonphysician must inform the woman of the availability of printed materials published by the State describing the fetus and providing information about medical assistance for childbirth, information about child support from the father, and a list of agencies which provide adoption and other services as alternatives to abortion."  *Id.*  The statute expressly left the decision whether to review and consider such information entirely up to the woman herself.  *Id.*; *see also* 18 Pa. Cons. Stat. § 3205 (a)(2)(i) (copy of state-published materials to be provided to patient "if she chooses to review it").  And, the physician was excused from complying with *all* of these requirements if "he or

23

she reasonably believed that furnishing the information would have resulted in a severely adverse effect on the physical or mental health of the patient." *Casey*, 505 U.S. at 883-84 (quoting § 3205).[8]

The *Casey* plaintiffs argued that § 3205 violated both a woman's due process right to terminate her pregnancy and a physician's First Amendment right against compelled speech. *Id.* at 881-84. Notably, in their First Amendment challenge, the physicians did not object to the *substance* of much of the speech required by § 3205 because most *already* was part of standard informed consent and medical practice. *Id.* at 884 (reviewing under First Amendment requirement that physicians disclose nature of procedure, health risks of abortion and childbirth, and gestational age of pregnancy). The appeals court opinion in the case makes clear that, even before § 3205 was enacted, the *Casey* plaintiffs were providing their patients with information about the nature of the abortion procedure and the risks and alternatives to the procedure, the probable gestational age of the pregnancy, and the risks of carrying to term. *See Planned Parenthood v. Casey*, 947 F.2d 682, 703-707 (3d Cir. 1991). The physicians' objection to this particular information was *not* to its substance but, *inter alia*, to the waiting period and the fact that the physicians personally had to provide it to patients rather than relying

_____

[8] As Appendix A reflects, Section 90-21.82 of the Act contains similar provisions to the *Casey* statute. The Physicians have not challenged these requirements and they are not at issue in this appeal.

24

on trained counselors. *Id.*[9] Thus, the *Casey* plurality reasonably could have concluded that this portion of § 3205 had "only an indirect effect on protected speech," and heightened scrutiny was not required. *Riley*, 487 U.S. at 789 n.5.

Crucially, the only part of § 3205 that the physicians challenged in substance under the First Amendment was the requirement that they tell their patients about "the availability of printed materials published by the State describing the fetus and providing information about medical assistance for childbirth." *Casey*, 505 U.S. at 881. This portion of the *Casey* statute, however, only required physicians to *offer* to patients the state's *own* speech, in state-created pamphlets, and only when the offer itself would not harm the patient. *See supra.*

The *Casey* plurality evaluated the due process claim against Section 3205 first. It held that "the giving of truthful, nonmisleading information about the nature of the procedure, the attendant health risks and those of childbirth, and the 'probable gestational age' of the fetus" was not an "undue burden" on a woman's abortion right. *Casey*, 505 U.S. at 882. The plurality similarly held that "requiring that the woman be informed of the availability of information relating to fetal

---

[9]  *See also Casey*, 505 U.S. at 881 ("Petitioners challenge the statute's definition of informed consent because it includes the provision of specific information by the doctor and the mandatory 24-hour waiting period.'); *id.* at 884 (stating that plurality was reconsidering holding in *City of Akron v. Akron Ctr. for Reproductive Health, Inc.*, 462 U.S. 416, 448 (1983), that "the State may not require that a physician, as opposed to a qualified assistant, provide information relevant to a woman's informed consent").

development and the assistance available should she decide to carry the pregnancy to full term is a reasonable measure to ensure an informed choice." *Id.* at 883.

The plurality then separately considered the physicians' First Amendment claim. It stated: "[a]ll that is left of petitioners' argument is an asserted First Amendment right of a physician not to provide information about the risks of abortion, and childbirth, in a manner mandated by the State." *Id.* at 884. "To be sure," the plurality explained, "the physician's First Amendment rights not to speak are implicated," *id.* (citing *Wooley v. Maynard*, 430 U.S. 705 (1977)), "but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State," *id.* (citing *Whalen v. Roe*, 429 U.S. 589, 603 (1977)). The plurality then upheld the provision without heightened review, stating only: "We see no constitutional infirmity in the requirement that the physician provide the information mandated by the State *here*." *Id.* (emphasis added).

As the "here" in the just-quoted sentence reflects, *Casey*'s First Amendment holding is quite limited. The plurality in *Casey* declined to apply heightened scrutiny to an informed consent provision when (i) one part of the provision arguably had only an "indirect effect" on speech, (ii) the part of the provision that directly affected physician speech only required physicians to *offer* their patients state-created pamphlets containing the *state's* speech, and (iii) the provision in its entirety did not apply if the physician concluded that compliance would harm the

26

patient, and thus "the statute [did] not prevent the physician from exercising his or her medical judgment," *id.*

**B.    The State's Proffered Rule That Compelled Speech In The Abortion Or Physician Context Is Automatically Subject Only To Rational Basis Review Finds No Support In *Casey***

The State brushes aside the limited nature of *Casey*'s First Amendment holding and argues that *Casey* controls the outcome in this very different case because it stands for two separate but related propositions.  First, following the Fifth Circuit's decision in *Texas Medical Providers Performing Abortion Services v. Lakey*, 667 F.3d 570 (5th Cir. 2012), the State presses for an abortion-only First Amendment rule:  that all abortion regulations that compel factual speech receive nothing but rational basis review under the First Amendment so long as they do not impose an "undue burden" on the right to abortion.  State Br. 13-20, 22.  Second, the State contends that *Casey* and lower court decisions concerning the so-called "professional speech" doctrine stand for the even broader proposition that *all* "challenges to laws that regulate 'the practice of medicine' are subject only to rational basis review."  State Br. 15; *see also id.* at 22-28.  Both of these propositions are undermined by *Casey* itself, as well as by other precedent from the Supreme Court and this Court.

1.    *Casey* **Did Not Create An Abortion Exception To The First Amendment**

The State's argument that *Casey* establishes a special First Amendment rule

27

for abortion cases relies heavily on the Fifth's Circuit's erroneous decision in

*Lakey*.[10]  In upholding a similar (but not identical) coercive ultrasound law against

a First Amendment challenge, the Fifth Circuit committed numerous analytical

errors that the State repeats in its brief.  Most fundamentally, *Lakey* conflates the

analysis of two constitutional rights.  Its holding rests on the conclusion that *Casey*

largely did away with First Amendment analysis of laws regulating abortion

because, in its view, all that matters when the state compels speech by physicians

who provide abortions is whether that speech imposes an "undue burden" on a

woman.  *Lakey*, 667 F.3d at 576; *see also id.* at 577 ("If the disclosures . . . would

not violate the woman's privacy right under the *Casey* plurality opinion, then

Appellees would, by means of their First Amendment claim, essentially trump the

balance *Casey* struck between women's rights and the states' prerogatives.").

But *Lakey*'s approach ignores the independent vitality of constitutional

provisions, each of which provides unique and distinct protections.  *See Stuart*,

---

[10] As the District Court observed, *see Stuart*, 2014 WL 186310 at *16, the Eighth Circuit committed many of the same analytical errors in *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 686 F.3d 889 (8th Cir. 2012) (en banc). In that decision, the court rejected a First Amendment compelled speech challenge to a regulation requiring a physician to provide certain written information to a patient prior to performing an abortion after conflating the undue burden standard with the First Amendment standard.  *See id.* at 893, 894.  Even *Rounds* recognizes, however, that a physician cannot be compelled "simply to speak the State's ideological message," which is exactly what the Requirement does.  *See infra* at Part II.A.

28

2014 WL 186310 at *17 ("Nowhere else in First Amendment law is the state's effort to compel speech evaluated by determining whether the compelled speech violates a different constitutional right . . . ."); *cf. United States v. Williams*, 553 U.S. 285 (2008) (analyzing First Amendment and Due Process claims separately). Thus, whether a law violates the First Amendment is a distinct inquiry from whether it violates the right to terminate a pregnancy.

Indeed, *Casey* itself undermines the holding of *Lakey*. *Casey* did not hold that a statute that could survive the undue burden inquiry—a legal test analyzed from the *patient's* point of view—is therefore automatically immune from a First Amendment challenge by a physician affected by the law, no matter the substance of the law or its effect on physician speech. To the contrary, the plurality in *Casey* recognized that the physicians' First Amendment rights were implicated and analyzed their First Amendment claim *separately from* the undue burden claim of the patients. *See* 505 U.S. at 881-84. As the District Court correctly explained, *Casey* did not decide "by implication" that "long established First Amendment law was irrelevant when speech about abortion is at issue." *Stuart*, 834 F. Supp. 2d at 430; *see also Stuart*, 2014 WL 186310 at *17 ("*Casey* did not purport to carve out a new First Amendment exception or create a new standard of review for all

abortion-related speech cases.").[11]

To the extent the State adopts *Lakey*'s suggestion that abortion regulations should pass *First Amendment* scrutiny so long as they compel speech that is "'truthful,' 'nonmisleading,' and 'relevant . . . to the decision' to undergo abortion,'" 667 F.3d at 575 (quoting *Casey*, 505 U.S. at 882); State Br. 22, both *Lakey* and the State completely misread *Casey*. The truthful/nonmisleading discussion in *Casey* is part of the undue burden analysis, not the First Amendment analysis. *See Casey*, 505 U.S. at 882. In any event, the plurality in *Casey* says only that detailed information about fetal development "*may* be permissible" when all the state does is make information that is truthful and not misleading *available* to patients in state-produced pamphlets, and even then only if the physician believes doing so will not harm the patient. *Id.* (emphasis added). In contending

---

[11] *Lakey* also incorrectly suggests that *only* compelled ideological speech warrants heightened scrutiny. 667 F.3d at 576. The Supreme Court, this Court, and numerous federal appellate courts have expressly rejected this contention and have applied the equivalent of strict scrutiny to compelled factual disclosures. *See, e.g., Riley*, 487 U.S. at 797-98; *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 189-90 (4th Cir. 2013) (en banc) (affirming at preliminary injunction stage district court's application of strict scrutiny to law compelling crisis pregnancy centers to post signs disclosing that a "licensed medical profession" is not on staff); *Hersh v. United States*, 553 F.3d 743, 764, 766 (5th Cir. 2008) (applying heightened scrutiny to a law compelling "attorneys to provide 'assisted persons' with written notice of certain basic information regarding bankruptcy proceedings"); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1284 n.4 (10th Cir. 2004) ("[T]he First Amendment's proscription of compelled speech does not turn on the ideological content of the message that the speaker is being forced to carry.").

that the Requirement would survive under *Casey*, the State would profoundly

change this standard:  the State would equate for First Amendment purposes a law

requiring physicians to make state-produced information *available* to women to

review *if they so choose* and if the physicians believe it will not harm them, with a

law requiring physicians to speak and display the state's message, even when the

women have no interest in seeing or hearing it and when the physicians believe it

will harm them.

The State's analysis of *Casey*, based on the erroneous *Lakey* decision, is

wrong on all fronts.  The Court should reject the State's suggestion that a special

First Amendment rule applies when the state compels speech in the abortion

context.[12]

### 2.     *Casey* Did Not Create A Physician Exception To The First Amendment

The State also presents a broader argument not limited to abortion.  It

believes that *Casey* stands for the even more sweeping proposition "that challenges

---

[12] The State thus errs in relying on the undue burden standard generally, and on *Gonzales v. Carhart*, 550 U.S. 124 (2007) and *Planned Parenthood v. Abbott*, 748 F.3d 583 (5th Cir. 2014), in particular.  *See* State's Br. 8-12.  Neither of these cases has any bearing on this appeal.  *Gonzales* concerned an undue burden challenge to a law that banned a particular kind of abortion procedure, not an "informed consent" statute, and it did not involve any First Amendment claim or analysis at all.  550 U.S. at 132.  Similarly, *Abbott* involved challenges to abortion restrictions very different from the Requirement and did not touch on the First Amendment.  748 F.3d at 587.

31

to laws that regulate 'the practice of medicine' are subject only to rational basis review," regardless of the context of the regulation or particular issues it poses. State Br. 15.  But that rule is found nowhere in *Casey* for the reason already explained—*Casey*'s holding was necessarily limited to its facts, and did not extend to the whole of "the practice of medicine."

Neither *Casey* nor any other decision about physician speech holds that the courts essentially should rubber stamp under the First Amendment all regulations of the "practice of medicine."  *See infra* at Part II.A.  To the contrary, *Casey* analyzes the providers' First Amendment claims against the informed consent restriction at issue in that case, recognizes "the physician's First Amendment rights not to speak," and, by citing *Wooley v. Maynard*, 430 U.S. 705 (1977), makes clear that the state cannot simply force physicians to communicate its ideological messages through professional regulation.  505 U.S. at 884; *see also Wooley*, 430 U.S. at 714 (reaffirming "that the right of freedom of thought protected by the First Amendment against state action includes the right to speak freely and the right to refrain from speaking at all").  Indeed, contrary to the State's position, the Ninth Circuit has explained that *Casey* "recognized that physician speech is entitled to First Amendment protection because of the significance of the doctor-patient relationship."  *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002); *see also Wollschlaeger v. Farmer*, 880 F. Supp. 2d 1251, 1262, 1266 (S.D. Fla. 2012)

(applying heightened scrutiny and striking down on First Amendment grounds state law limiting physicians' ability to discuss firearm ownership with their patients).

The State insists that this Court consider only the conclusion in *Casey*—that rational basis was appropriate for reviewing the informed consent law at issue there—rather than its analysis in light of the underlying facts.  To justify its insistence, the State contends that the "fact that the [Requirement] mandates disclosures that extend beyond those required by the Pennsylvania law [at issue in *Casey*] cannot change the standard of review."  State's Br. 15.

But of course it can: the "level of scrutiny to apply to a compelled statement" turns on "the nature of the speech taken as a whole and the effect of the compelled statement thereon."  *Riley*, 487 U.S. at 796; *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 286 (4th Cir. 2013) (en banc) (holding that context is key to determining appropriate level of scrutiny under First Amendment).  The difference between the low level of scrutiny applied in *Casey* and the searching scrutiny required here, *see infra* at Part II.A, turns on the stark differences between the *Casey* regulation and the Requirement, all of which are mistakenly ignored by the State.

In particular, as explained earlier, *Casey* upheld an informed consent statute that, in part, simply required physicians to provide information that *already* was

part of their informed consent process, and thus only incidentally affected the physicians' speech. With respect to speech that was *not* part of the standard, preexisting process of obtaining informed consent (*e.g.*, the state materials on fetal development), *Casey*'s holding was extremely narrow. To the extent the plurality approved of allowing the state to provide its ideological message to patients, it did so only through the physician's *offer* of the state's *own speech*—with information in the state's publication—and even then only in circumstances when the physician concluded that the offer itself would not harm the patient.

The *Casey* plurality did not hold that the physician could be required, in his or her own voice, to adopt and communicate the state's message about the embryo or fetus, as the Requirement here mandates. "What the state can say itself is very different from what the state can compel individuals to say." *Stuart*, 834 F. Supp. 2d at 430 n.6 (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995)).

Further, nothing in the Pennsylvania statute at issue in *Casey* required physicians to communicate the state's anti-abortion message while the patient was lying vulnerable and exposed in the midst of a medical procedure, and even if the patient was closing her eyes and covering her ears. For all of these reasons, the District Court correctly concluded that the Requirement is "a much more significant intrusion than the *Casey* statute's relatively passive requirements"

34

because it "requires the provider to deliver in his or her own voice information the state deems relevant during the middle of a medical procedure in the exact manner dictated by the state." *Stuart*, 2014 WL 186310, at *12; *see also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 449 (1978) (observing for purpose of First Amendment analysis difference between written advertisements which "leave[] the recipient free to act . . . or not" and "in-person solicitations" which "may exert pressure and often demand[] an immediate response"); Appendix A (detailed chart comparing the Requirement to law at issue in *Casey*).

Crucially, the informed consent law that the *Casey* plurality considered respected the key ethical principles of patient waiver and therapeutic privilege and thus could have been considered "reasonable" regulation of medicine. *Casey*, 505 U.S. at 884. The Requirement, however, mandates that physicians speak to and treat their patients in ways that are anathema to the principles of medical practice and informed consent. *See supra* at pp. 12-14; *see also Stuart*, 2014 WL 186310, at *4, *13 & n.12. Indeed, the Requirement is not an informed consent law at all because it mandates that the physicians speak and act out the state's message even when the patient is *actively blocking out the speech*. In any event, the speech and expressive conduct the Requirement compels fall far outside reasonable regulation of medicine. As the District Court explained, "[t]here may be minimal First Amendment concerns when the state compels compliance with standards of

35

acceptable and prevailing medical practice, but when the state seeks to compel

speech outside those prevailing practices, the issue is quite different." *Stuart*, 2014

WL 186310, at *10 (internal quotation marks and citation omitted). For all of these

reasons and those detailed below, unlike the informed consent provision upheld in

*Casey*, the Requirement should be subjected to heightened scrutiny.

## II.     The Requirement Violates The Physicians' First Amendment Rights By Compelling Them To Speak The State's Message

The only question presented here is whether the Requirement's speech

mandate unconstitutionally compels the Physicians to speak against their will in

violation of the First Amendment. The answer to that question is yes, because the

Requirement cannot satisfy the exacting judicial scrutiny to which such speech

mandates are subject under the First Amendment.

### A.     Speech Mandates Like The Requirement Are Subject To Heightened Scrutiny Under Established First Amendment Principles

The First Amendment protects not only against government restrictions on

speech, but also against speech compelled by the government. "Since *all* speech

inherently involves choices of what to say and what to leave unsaid, one important

manifestation of the principle of free speech is that one who chooses to speak may

also decide what not to say." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of

Bos.*, 515 U.S. 557, 573 (1995) (internal quotation marks and citations omitted);

*see also Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l Inc.*, 133 S. Ct.

36

2321, 2327 (2013) (discussing "basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say" (internal quotation marks omitted)).

"[M]andating speech that a speaker would not otherwise make necessarily alters the content of the speech," and thus imposes "a content-based regulation of speech." *Riley*, 487 U.S. at 795. Content-based regulations of speech are presumed invalid, and the government bears the burden of showing their constitutionality. *See, e.g., United States v. Alvarez*, 132 S. Ct. 2537, 2544 (2012).

The "general rule" that the "speaker has the right to tailor the speech[] applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573. Thus, rules mandating speech are generally subject to exacting First Amendment scrutiny, regardless of whether they compel ideological or factual statements. *See, e.g., id.*; *Riley*, 487 U.S. at 798; *see also Centro Tepeyac*, 722 F.3d at 189-90, 192; *Hersh*, 553 F.3d at 764, 766; *Axson-Flynn*, 356 F.3d at 1284 n.4.

Under a straightforward application of the foregoing principles, the speech mandated by the Requirement is subject to heightened scrutiny. The State does not dispute that the Physicians would not comply with the Requirement's speech mandate voluntarily. JA 786. Although the Physicians offer their patients the opportunity to view ultrasound images, only a government mandate could force

37

them to engage in the speech compelled by the Requirement against a patient's will, or when doing so would compromise a patient's well-being. Even if, as the State argues, the speech mandated by the Requirement is purely factual and non-ideological, State Br. 24-25—which it is not, *see infra* at Part II.A.1—at the very least it requires "statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573. And because the Requirement mandates speech that the Physicians would not otherwise make, it "necessarily alters" the content of the Physicians' speech and must be tested under heightened scrutiny. *See Riley*, 487 U.S. at 795.

### 1. The Requirement Is Subject To Strict Scrutiny Because It Mandates Ideological Speech

The District Court correctly held that "[r]equiring a physician . . . to deliver the state's content-based, non-medical message in his or her own voice as if the message was his or her own constitutes compelled *ideological speech* and warrants the highest degree of First Amendment protection." *Stuart*, 2014 WL 186310, at *10 (emphasis added). No precedent or any plausible First Amendment principle permits the government to mandate ideological speech by a private party, even as part of an occupational regulation.

The State believes that the Requirement's speech mandate is non-ideological because the speech it mandates is "truthful," State Br. 28, but those two categories are not mutually exclusive—compelled speech need not be false to be ideological. *See R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1212 (D.C. Cir. 2012)

38

(noting that photographs FDA sought to compel cigarette manufacturers to include on their product labels were not false, but might qualify as ideological). Just as a photo of a dead soldier conveys more than purely factual information when shown at an anti-war protest, so do the ultrasound images that the Physicians are forced to display and describe under the Requirement.

This is so not because an ultrasound image or description is inherently ideological, but because of the factual context in which the message must be delivered: the Physicians must force images and descriptions of an embryo or fetus on a woman seeking an abortion while she is lying on the examination table, partially undressed, with an ultrasound probe inside or on her, even if she has expressly said that she does not want to see or hear the images. Further, the physician must force these images and sounds on the woman even when the physician believes that doing so will only distress and harm her. That is not simple factual disclosure; it is coercive proselytizing.

Indeed, the State's "just-the-facts" characterization of the Requirement cannot be taken seriously given the farce that the Requirement contemplates—that the Physicians must continue engaging in government-mandated speech as their half-naked patients don earplugs and blinders to avoid it. The State's own expert agrees that this exercise serves no purpose at all. JA 489. Certainly, it does not matter in these circumstances that the content of the speech compelled by the

39

Requirement is "factual," given that the patient does not hear it.  And the evidence is uncontradicted that requiring vulnerable patients to go to such lengths to avoid an unwanted message could be affirmatively harmful.  *See supra* at p. 13.  But the State does not care—the physician must continue speaking and acting out the state's script.  As the District Court held, what the Requirement compels in these circumstances is "performative rather than informative[] and . . . does not serve any legitimate purpose."  *Stuart*, 2014 WL 186310, at *12.  The Court should affirm the District Court's conclusion that the speech mandated here is ideological.

> ### 2.     Even If The Requirement Mandates Non-Ideological "Professional" Speech, It Is Not Shielded From Heightened First Amendment Scrutiny

But even if the Court chooses not to decide whether the Requirement mandates ideological speech, it should still subject it to heightened scrutiny.  Just as the State does not dispute that compelled ideological speech is subject to strict scrutiny, it also concedes that the government ordinarily cannot compel private parties' speech—even purely factual speech—without triggering heightened scrutiny under the First Amendment.  *See, e.g.*, *Riley*, 487 U.S. at 798 (subjecting to "exacting First Amendment scrutiny" requirement that professional fundraisers disclose to potential donors percentage of gross revenues actually turned over to charities by fundraiser); *Nat'l Assoc. of Manufacturers v. NLRB*, 717 F.3d 947, 956-57 (D.C. Cir. 2013) (striking down regulation that compelled employers to

post signs notifying employees of their rights under National Labor Relations Act).[13]  The State seeks to evade this principle by contending that under *Casey* and the so-called "professional speech" doctrine, *any* speech mandates (and, presumably, speech restrictions) that purport to regulate "the practice of medicine are subject only to rational basis review."  State's Br. 15.  As explained earlier, *Casey* does not stand for that proposition, and the cases concerning "professional speech" affirmatively refute it.

For example, the State relies on *Moore-King v. City. of Chesterfield*, State Br. 23, but that case did not concern a direct regulation of doctor-patient communication—it involved a fortune-teller licensing regulation that had only an "incidental effect" on speech.  708 F.3d at 569 (quotation omitted).  Because this Court held that the regulation "fit comfortably within the confines of professional speech analysis," *id.*, it declined to "delineate the precise boundaries of permissible occupational regulation under the professional speech doctrine."  *Id.* at 570.  But this Court made clear that the doctrine does "not . . . afford the government carte blanche in crafting or implementing" occupational regulations, and that the state

_____

[13] The D.C. Circuit held that the Board's final regulation violated NLRA § 8(c), 29 U.S.C. § 158(c), which authorizes employers to engage in speech so long as it "contains no threat of reprisal or force or promise of benefit."  717 F.3d at 954-55.  For purposes of its decision, however, the court assumed that the scope of the right protected by § 8(c) is coextensive with the right to freedom of speech as guaranteed by the First Amendment.  *Id*. at 955 & n.8.

41

has a diminished interest in regulating professions (like medicine) that regulate

themselves. *Id.*

      As to the regulation of medicine in particular, the State relies on *Pickup v.*

*Brown*, 740 F.3d 1208 (9th Cir. 2013). *See* State Br. 22-24. But that case (similar

to *Moore-King*) refutes the proposition that the state may regulate the "practice of

medicine" at will. In *Pickup*, the Ninth Circuit affirmed its earlier holding in

*Conant v. Walters* that heightened scrutiny is applicable to restrictions on

physician speech due to the significance of the doctor-patient relationship. *See* 740

F.3d at 1227 (denying motion for rehearing en banc and replacing panel decision

published at 728 F.3d 1042 (2013)). According to *Pickup*, "doctor-patient

communications *about* medical treatment"—like the Requirement, *see infra*—

"receive *substantial First Amendment protection*, but the government has more

leeway to regulate the conduct necessary to administering the treatment itself."

740 F.3d at 1227 (emphasis added).

      The "professional speech" cases on which the State relies thus make clear

that all regulations of the "practice of medicine" do *not* evade heightened First

Amendment scrutiny. Rather, these cases stand for the proposition that, as in any

other First Amendment challenge, the level of scrutiny depends on the particulars

of the challenged regulation and the context in which it operates. *See Riley*, 487

U.S. at 796 (holding that the "level of scrutiny to apply to a compelled statement"

turns on "the nature of the speech taken as a whole and the effect of the compelled statement thereon").[14]  Here, in stark contrast with the informed consent provision at issue in *Casey*, the context surrounding the Requirement dictates that the most exacting scrutiny should apply, for several reasons.

First, there can be no genuine dispute that the Requirement significantly impinges on the Physicians' relationship with their patients.  Indeed, the whole point of the Requirement is to replace what the Physicians would normally tell their patients with the state's own message, delivered by the Physicians in their own voice under threat of penalty.

As the very professional speech cases on which the State relies demonstrate, the First Amendment does not permit this sort of interference.  As just explained, the Ninth Circuit has applied higher scrutiny to those restrictions that interfere with physician-patient communication *about* treatment than those rules which "regulate the conduct necessary to administer[] treatment itself."  *Pickup*, 740 F.3d at 1227.

---

[14] As the District Court explained, the standard of scrutiny applied to regulations affecting professional speech must be:

> viewed on a continuum, taking into account the regulatory context, the nature of the professional relationship, the degree of intrusion into the relationship, the reasons and evidentiary support for the intrusion, and the connection between the compelled speech and the government's interests.

*Stuart*, 2014 WL 186310, at *9.

The Requirement at issue in this case quite obviously falls on the protected side of that line:  it does not merely regulate "conduct necessary to administering treatment," *id.*, but specifically tells a physician what he or she must say to a patient contemplating treatment, even when the patient does not want to hear or see what the physician is required to show and say, and even when the physician believes that complying with the Requirement would affirmatively hurt the patient. No one would think permissible a law *prohibiting* physicians from showing and describing an ultrasound to patients contemplating abortion even if the patient wanted to see and hear it—such a law would undoubtedly impinge on "doctor-patient communications about medical treatment," and would thus "receive substantial First Amendment protection."  *Id.*; *see also Wollschlaeger*, 880 F. Supp. 2d at 1263 (applying heightened scrutiny and striking down under First Amendment state law that, *inter alia*, restricted physicians' speech with their patients).  The same is true of the mirror-image speech that the Requirement compels.  *See Riley*, 487 U.S. at 797 (explaining the "constitutional equivalence of compelled speech and compelled silence").

Indeed, the State's attempt to commandeer physician-patient communications impermissibly "alters the traditional role of medical professionals" and undermines "the proper functioning of [the medical] system[]." *Conant*, 309 F.3d at 638 (internal quotation marks omitted).  The entire medical

44

system would be jeopardized if patients could not reasonably assume that a physician's speech reflects only the patient's interests, rather than the state's. *See LSC v. Velazquez*, 531 U.S. 533, 544 (2001) (stating that "[r]estricting . . . attorneys in advising their clients and in presenting arguments and analyses to the courts distorts the legal system by altering the traditional role of the attorneys"). No such assumption would be reasonable if states could force doctors to speak the state's message in their communications about medical treatment.

Second, the Requirement is also a suspect speech regulation because it is entirely inconsistent with the traditional understanding of informed consent and current norms of medical practice. Both traditional and current understanding of medical ethics is crucial to the First Amendment inquiry here.[15] As to tradition, the Supreme Court recently and repeatedly has made clear that courts should not recognize exceptions to the prohibition on content-based speech regulations unless those exceptions are historically grounded. *See Alvarez*, 132 S. Ct. at 2544 ("[C]ontent-based restrictions on speech have been permitted, as a general matter, only when confined to the few 'historic and traditional categories of expression long familiar to the bar.'"); *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729,

---

[15] Thus, as the District Court correctly observed, it is not surprising that actual informed consent laws have "raised barely a whisper of First Amendment concern" as such laws have historically been closely linked to standards of the profession. *Stuart*, 2014 WL 186310 at *7 n.19.

2734 (2011) (same); *United States v. Stevens*, 559 U.S. 460, 468 (2010) (same).

And as to current medical practice, this Court has made clear that when an

occupation (like medicine) "is subject to independent regulation by canons of the

profession . . . the government's own interest in forbidding that speech is

diminished." *Garcetti v. Ceballos*, 547 U.S. 410, 446 (2006) (Breyer, J.,

dissenting); *see Moore-King*, 708 F.3d at 570 (citing Justice Breyer's dissent in

*Garcetti* and explaining that government interest in regulating professional speech

is diminished where an "accrediting institution like a board of law examiners or

medical practitioners exists").

Here, the relevant traditional and current understanding of informed consent

is clear.  The traditional law of informed consent has always recognized—and, as

the undisputed facts before the District Court confirmed, current medical practice

continues to recognize—at least two exceptions key to the informed-consent

process:  patient waiver and therapeutic privilege.  Under the principle of patient

waiver, the patient may validly make the decision not to receive information

related to her medical care.  *See, e.g.*, Richard E. Shugrue & Kathryn

Linstromberg, *The Practitioner's Guide to Informed Consent*, 24 CREIGHTON L.

REV. 881, 908 (1991) (discussing waiver exception to informed consent).  Indeed,

the State's own expert agreed that medical ethical requirements normally preclude

a physician from acting over the objection of a competent patient.  *See* JA 481,

794. And, under the therapeutic privilege exception, disclosure is not required
"when risk-disclosure poses such a threat of detriment to the patient as to become
unfeasible or contraindicated from a medical point of view." *Canterbury v.
Spence*, 464 F.2d 772, 789 (D.C. Cir. 1972); *see also* Shugrue & Linstromberg,
*supra*, at 905. The record before the District Court made clear that these
exceptions are inherent to the ethical requirements for the practice of medicine in
North Carolina. *See Stuart*, 2014 WL 186310, at *4, *13 & n.12 (recognizing
waiver and therapeutic privilege exceptions); *see also* JA 449-55, 481.

The Requirement is irreconcilable with these principles. It not only seeks to
regulate speech that is already subject to extensive rules of medical ethics, but also
seeks to force the Physicians to communicate with their patients in a manner
explicitly contrary to those rules, even when their patients attempt to physically
shield themselves from seeing the required image and hearing the required script—
i.e., in circumstances in which the State's own expert admitted that the
Requirement serves no legitimate purpose, and which in fact could affirmatively
harm the patient. The First Amendment does not shield speech regulation so far
outside the bounds of accepted norms of medical ethics from searching scrutiny.

Third and finally, heightened First Amendment scrutiny is also warranted
because the Requirement forces the Physicians to speak the state's message to a
captive listener. In determining the character of regulated speech, "context

47

matters," and "[f]rom a First Amendment free speech perspective, that context includes the viewpoint of the listener." *Greater Baltimore Ctr. for Pregnancy Concerns*, 721 F.3d at 286.

For decades, the Supreme Court has upheld limits on private speech that intrudes on an "unwilling listener." *See, e.g.*, *FCC v. Pacifica Found.*, 438 U.S. 726, 748-49 (1978) (explaining that government is afforded greater discretion to protect against offensive material broadcast over airwaves (as opposed to other public forums) because these undesired messages are almost impossible for listeners to avoid); *see also Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007) (upholding dismissal of teacher because "[t]he Constitution does not entitle teachers to present personal views to *captive audiences*" (emphasis added)). This right to avoid unwanted speech is particularly important for persons in private spaces. *See Pacifica*, 438 U.S. at 749 n.27 ("[G]overnment may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be banned from the public dialogue . . . ." (internal quotation marks omitted)). The same First Amendment principles militate in favor of heightened scrutiny when the government forces a private speaker to convey its own message to a captive audience. *Cf. Lee v. Weisman*, 505 U.S. 577, 598 (1992) (explaining that school prayer exercises "are especially improper because the State has in every practical

48

sense compelled attendance and participation in an explicit religious exercise at an event of singular importance to every student, one the objecting student had no real alternative to avoid").

Here, the patient is literally a captive of the physician (by fiat of the state): the physician must deliver the state's message while the patient is lying on the examination table partially undressed. To be sure, the patient can avoid seeing and hearing the state's mandated message by wearing blinders and earplugs, but that does not solve the problem. *See supra* at p. 13 (discussing harm that occurs when a woman has to cover her ears to avoid hearing the state's message); *see also Pacifica*, 438 U.S. at 748-49 (discussing harm of being subjected to unwanted speech). And, as the District Court recognized, in the context of this case, the effect of the mandated speech on the patient can be particularly harmful. That the State has mandated private parties to speak its message in a way that the listener can only avoid through absurd and potentially harmful means is an additional basis to subject the Requirement to heightened scrutiny.

### B. The Requirement Cannot Satisfy Strict or Intermediate Scrutiny

Whether considered ideological or "factual," the Requirement is subject to strict scrutiny because it compels protected, non-commercial speech.[16] *See Riley*, 487 U.S. at 798. The District Court suggested that even though the speech at issue

---

[16] The State does not argue that the speech at issue is commercial.

49

here is *not* commercial, professional-speech regulations of this type might receive the same intermediate scrutiny typically given to commercial-speech regulations. *See Stuart*, 2014 WL 186310, at *11. Ultimately, the District Court did not decide which level of heightened scrutiny applies, because it found that the outcome would be the same regardless of "'whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied.'" *Id.* (quoting *Sorrell*, 131 S. Ct. at 2667). This Court need not decide that question either, as the Requirement unquestionably fails under both standards.

Even under intermediate scrutiny, "the State must show at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." *Sorrell*, 131 S. Ct. at 2667-68. To satisfy this standard, the State must show that the harms it seeks to prevent are "real, not merely conjectural." *Turner Broad. Sys. v. FCC*, 512 U.S. 662, 664 (1994). And "[t]here must be a fit between the legislature's ends and the means chosen to accomplish those ends." *Sorrell*, 131 S. Ct. at 2668 (internal quotation marks omitted); *see also Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002) (holding that under intermediate scrutiny, a law must "not [be] more extensive than is necessary to serve [the state's] interest"). The State cannot come close to satisfying this standard, let alone the strict scrutiny that should apply.

The State contends that the Requirement is narrowly drawn to advance three

50

substantial interests: (i) ensuring informed consent (State Br. 29); (ii) "ensuring

that women are not rushed or coerced into having an abortion" (State Br. 30-31);

and (iii) "persuading pregnant women to opt for childbirth over abortion" (State

Br. 29-30). Not so.

### 1.  Informed Consent And Preventing Coercion

The State contends that the Requirement furthers the related interests of

"ensuring that women seeking an abortion are fully informed about the effect of

that medical procedure on the fetus," and that "women are not rushed or coerced

into having an abortion." State Br. 29-30. Those may be legitimate interests in

themselves, but as already explained, a state's legitimate interest in assuring that

patients make informed and autonomous medical decisions has never been

understood to allow overriding the patient's own decision about what information

she needs, and it certainly has never been thought to require physicians to engage

in speech even when it would *affirmatively harm the patient*, which is exactly what

the Requirement requires the Physicians to do.

In any event, the Requirement does not in fact advance an interest in

assuring informed and deliberate decisionmaking, because if the State really

thought that hearing and seeing the mandated message was necessary for informed

consent, the Requirement would not "itself provide[] that women can give

informed consent without actually seeing the images or hearing the description."

51

*Stuart*, 2014 WL 186310, at *12.  And if the State really cared about informed consent, it would not mandate speech even in circumstances in which its "own expert witness agrees that the delivery of the state's message . . . does not provide any information" or "aid voluntary and informed consent."  *Id*.

Finally, as to its asserted interest in preventing "rushed or coerced" abortions, the Requirement is a solution in search of problem.  An asserted state interest must be "real, not merely conjectural," *Turner*, 512 U.S. at 664, and yet, as the District Court concluded, "[t]here is no evidence before the Court" that women are being coerced into having abortions, "even in small measure."  *Stuart*, 2014 WL 186310, at *15.  Indeed, "[a]ll of Plaintiffs' evidence is to the contrary."  *Id.* And "[e]ven assuming provider-coerced abortion is a real and not theoretical harm, the state has not shown that the speech-and-display provision is directed at alleviating this harm."  *Id.*

Even if the Requirement legitimately advanced the State's interest in informed and deliberate consent, it is not remotely tailored to furthering that interest.  For one thing, other portions of the Act to which the Physicians do not object *already* require the Physicians to *offer* their patients the opportunity to view ultrasound images and receive state-published materials concerning fetal development and the risks of abortion, and mandate a 24-hour waiting period (as in *Casey*).  *See supra* at pp. 8-9.  The State says, without an iota of support in the

52

record, that these provisions "would not be as effective in furthering the State's interests." State Br. 33. But even under intermediate scrutiny, this sort of bald, unsupported assertion cannot carry the State's burden. Similarly, the State does not even attempt to explain why it could not craft an alternative that does not force the Physicians to violate their ethical obligations by complying with the speech mandate even when it would harm their patients. And then there is the elephant in the room—the provision requiring the Physicians to continue with the compelled script even when the patient puts on eye blinders and earplugs. Remarkably, the State does not even mention this uncomfortable aspect of the Requirement, but the contention that the Requirement is sufficiently tailored in light of this feature refutes itself: surely one can imagine an alternative scheme under which the Physician does not have to act as the State's mouthpiece *when no one is even listening*. Such a mandate is far "more extensive than is necessary" to advance any state interest. *Thompson*, 535 U.S. at 367 (citation omitted).

In short, the Requirement "burdens substantially more speech than necessary" as "[t]here are many other ways to provide . . . information to patients without hijacking the provider's voice in the middle of a medical procedure," as the District Court correctly held. *Stuart*, 2014 WL 186310, at *16.

### 2.    Persuading Pregnant Women To Forego Abortion

The State also contends that it has a "compelling interest in persuading

pregnant women to opt for childbirth over abortion." State Br. 29. As explained earlier, that is simply a refreshing acknowledgment that the Requirement by design commandeers the Physicians to communicate in their own voices not only the state's preferred content, but also its viewpoint, which the First Amendment simply prohibits. *See supra* at Part II.A. Again, the government can push a viewpoint through its *own* speech, which is why there was no First Amendment problem with the requirement in *Casey* that doctors make available *state-published* brochures about embryonic and fetal development to their patients. But "the Supreme Court has never held that the government may use a professional's voice to do the same." *Stuart*, 2014 WL 186310, at *16. To the contrary, the Court has held that "where the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Wooley*, 430 U.S. at 716.

In any event, even if the State could legitimately conscript the Physicians to carry its anti-abortion message, its effort here still fails the tailoring test for the same reasons discussed above: the State makes no effort to explain (i) why existing law (which in large part parrots the law at issue in *Casey*, and which requires an *offer* to view ultrasound images rather than forcing the experience upon women irrespective of their objections) is not sufficiently protective of its interest in persuading women to carry to term; (ii) why that interest could not be advanced

54

without requiring Physicians to harm their patients and thus violate their ethical

obligations; and (iii) how a law that compels speech that no one hears can possibly

satisfy the tailoring requirement of heightened scrutiny.

    In sum, if the State wants to persuade women to choose childbirth over

abortion, it must find other ways to do so.  The First Amendment does not permit

the State to conscript physicians into providing the State's message in their own

voice, and especially not in the coercive manner dictated by the Requirement.

## III.    If The Court Believes The Requirement Is Consistent With The First Amendment, It Should Remand For The District Court To Consider The Physicians' Other Challenges To That Provision

    Apart from the Physicians' First Amendment challenge to the Requirement,

they also challenged that provision on behalf of themselves and their patients as

irrational and therefore inconsistent with due process.  *Stuart*, 2014 WL 186310, at

*18-*19.  The District Court did not consider that argument because it invalidated

the Requirement under the First Amendment.  *Id.* at *19.  If the Court disagrees

with that conclusion, it should remand for the District Court to consider in the first

instance the due process challenge.

55

## CONCLUSION

For the foregoing reasons, the District Court's judgment should be affirmed.

Respectfully submitted,

/s/ Julie Rikelman

CHRISTOPHER BROOK
AMERICAN CIVIL LIBERTIES UNION
OF NORTH CAROLINA LEGAL
FOUNDATION
P.O. Box 28004
Raleigh, North Carolina 27611
(919) 834-3466

ANDREW D. BECK
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
New York, New York 10004
(212) 284-7318

DIANA O. SALGADO
PLANNED PARENTHOOD FED. OF
AMERICA
434 W. 33rd Street
New York, New York 10001
(212) 541-7800

JULIE RIKELMAN
JENNIFER SOKOLER
CENTER FOR REPRODUCTIVE RIGHTS
120 Wall Street, 14th Floor
New York, New York 10005
(917) 637-3670

WALTER DELLINGER
ANTON METLITSKY
LEAH GODESKY
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300

HELENE T. KRASNOFF
PLANNED PARENTHOOD FED. OF
AMERICA
1110 Vermont Avenue N.W., Suite
300
Washington, D.C. 20005
(202) 978-4800

56

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,398 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

/s/ Julie Rikelman
Julie Rikelman

# APPENDIX A

The chart below shows the stark differences between the obligations of the

Pennsylvania statute at issue in *Casey* and the Requirement.  The provisions of the

Requirement that the District Court enjoined are highlighted and do not have

analogs in the Pennsylvania statute:

|  | **N.C. Women's Right to Know Act** | **Statute in *Casey*[17]** |
|---|---|---|
| **Physician** | Must orally inform woman of medical risks associated with abortion, the probable gestational age of the fetus, and the "medical risks associated with carrying the child to term."  N.C.G.S. §§ 90-21.82(1)(b)-(d). | Same.  18 PA. CONST. STAT. §§ 3205(a)(1)(i) -(iii), (2)(ii)-(iii) (2012).*  <br><br>    *Waived if physician reasonably believes that "furnishing the information would have resulted in a severely adverse effect on the physical or mental health of the patient."  *Id.* at § 3205(c) ("Med. J. Exception"). |
|  | Must notify patient of "right to review the printed materials" prepared by the State that "describe the unborn child and list agencies that offer alternatives to the abortion."  If the woman chooses, these materials will be provided to her free of charge. N.C.G.S. §§ 90-21.82(2)(e), .83. | Same.  18 PA. CONST. STAT. § 3205(a)(2)(i).*  <br><br>    * Subject to Med. J. Exception |

---

[17] This chart does not reflect all obligations imposed by the North Carolina and Pennsylvania statutes.  The text of the statute at issue in *Casey* can be found at 505 U.S. at 902-04.

| | |
|---|---|
| Must perform an "obstetric real-time view of the unborn child" and "display the images so that the pregnant woman may view them." N.C.G.S. § 90-21.85(a)(1), (3). | None. |
| Must give a simultaneous explanation of the ultrasound display, including "the presence, location, and dimensions of the unborn child within the uterus," and a "medical description of the images, which shall include the dimensions of the embryo or fetus and the presence of external members and internal organs, if present and viewable." *Id.* § 90-21.85(a)(2), (4). | None. |
| Must provide the woman "the opportunity to hear the fetal heart tone." *Id.* § 90-21.85(a)(2). | None. |
| Must require the woman to wait at least four hours after the display and description, and to certify whether or not she "availed herself of the opportunity to view the image," before performing an abortion. *Id.* § 90-21.85(a), (a)(5). | None. |

# United States Court of Appeals
## for the Fourth Circuit

14-1150, *Gretchen S. Stuart, M.D. v. Paul S. Camnitz, M.D., et al.*

## <u>CERTIFICATE OF SERVICE</u>

I, Maryna Sapyelkina, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

On **June 24, 2014**, Counsel for Appellees have authorized me to electronically file the foregoing **Brief for Plaintiffs-Appellees** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> John Foster Maddrey
> Isham Faison Hicks
> Gary Robert Govert
> NORTH CAROLINA DEPARTMENT OF
>   JUSTICE
> 114 West Edenton Street
> P. O. Box 629
> Raleigh, NC 27602
> jmaddrey@ncdoj.gov
>
> Attorneys for Defendants-Appellants

Unless otherwise noted, 8 paper copies have been filed with the Court on the same date via U.S. Express Mail.

June 24, 2014                                      /s/ Maryna Sapyelkina
                                                   Maryna Sapyelkina